Lois E. JENSON, et al., Plaintiffs,

v.

EVELETH TACONITE COMPANY, et al., Defendants.

Civ. No. 5–88–163.

United States District Court, D. Minnesota, Third Division.

May 14, 1993.

Paul Sprenger and Jean Boler, Sprenger & Lang, Minneapolis, MN, for plaintiffs.

Mary Stumo and David Goldstein, Faegre & Benson, Minneapolis, MN, for defendants Eveleth Taconite Co., Eveleth Expansion Co., Oglebay Norton Co. and Oglebay Norton Taconite Co., d/b/a Eveleth Mines.

Scott Higbee, Peterson, Engberg & Peterson, Minneapolis, MN, for defendant U.S. Workers of America, Local 6860.

MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter came on for trial before the undersigned on December 21–23 and 28–30, 1992 and February 2, 1993. The Plaintiff

Class,[1] consisting of women who applied for employment or were employed in hourly positions at a taconite mining facility owned and operated by defendants Eveleth Taconite Company, Eveleth Expansion Company, Oglebay Norton Company, and Oglebay Norton Taconite Company (collectively, "Eveleth Mines"),[2] alleged that Eveleth Mines violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (Title VII), and the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 1(2) (1988) ("MHRA"), by discriminating against women on the basis of their sex, including engaging in acts of sexual harassment.[3]

On motion of the Plaintiff Class, the litigation was bifurcated into two phases: (1) a "liability" phase to determine whether the defendants violated Title VII and/or MHRA; and if liability was established, (2) a "recovery" phase to determine the eligibility of individual class members for compensatory relief. *Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir.1984).

### PLAINTIFFS' ALLEGATIONS

The Plaintiff Class (hereinafter, "Plaintiffs") allege that Eveleth Mines has engaged in a pattern of discriminatory practices, including discrimination in hiring, and in terms and conditions of employment such as job assignment, promotion, compensation, discipline and training. Plaintiffs also allege sexual discrimination based upon sexual harassment—the existence of a work environment that is hostile to women.

### DEFENDANTS' ALLEGATIONS

Eveleth Mines and the Union deny the Plaintiffs' claims and state that hiring practices at Eveleth Mines, as well as the terms and conditions of employment, are conducted in a non-discriminatory manner. Eveleth Mines further alleges that it has had a practice of immediately investigating and correcting sexual harassment when it knows or reasonably should know of its existence, and that it has adhered to that practice at all relevant times.

### MEMORANDUM OPINION

Based upon the admissible evidence[4] adduced at trial[5] and upon all the files, records and proceedings herein, as well as the arguments of counsel, the court issues the following Memorandum Opinion, which shall constitute the Court's Findings of Fact and Conclusions of law, in accordance with Fed. R.Civ.P. 52(a).[6]

1. *See Jenson v. Eveleth Mines,* 139 F.R.D. 657, 667 (D.Minn.1991).

2. On March 26, 1993 Eveleth Mines filed and served a Motion for Entry of Judgment and Dismissal From Further Proceedings on behalf of defendants Eveleth Taconite Company, Eveleth Expansion Company, and Oglebay Norton Company. That motion will heard in conjunction with the status conference to be held on June 22, 1993. *See* Order dated May 14, 1993.

3. Defendant United Steel Workers of America, Local 6860 (the "Union"), has been named as a defendant in this case only for purposes of formulating appropriate injunctive relief, if such relief is awarded. The Union is the certified bargaining representative for a unit of Eveleth Mines' hourly employees. Plaintiffs press no claims against the Union. Amended Complaint, ¶ 5.

4. The class certification hearing in this action was held between May 13, 1991, and June 3, 1991. By agreement of counsel, the evidence adduced at the class certification hearing was considered as having been introduced as part of the case-in-chief; accordingly, the record of the class certification proceedings was also part of the trial in this action.

5. Prior to the December, 1992 portion of the trial, the Court directed the parties to summarize the record from the class certification hearing and designate those portions of the record that the parties considered relevant to issues of liability. The defendants have made numerous objections to many of Plaintiffs' designations. The Court has reviewed those objections and has overruled them.

In addition, the defendants also made numerous objections to the plaintiffs' deposition designations under Fed.R.Civ.P. 32. The Court has reviewed those objections and also concluded that they will be overruled.

6. Contained herein are citations to the record of both the 1991 proceedings and the December, 1992 and February, 1993 proceedings. Citations to the 1991 proceedings appear in Roman numerals (representing the specific volume of the transcribed proceedings) and page numbers, e.g., "III, 45." Citations to the transcript of the 1992/1993 proceedings appear in page numbers, e.g., "T. Tr., 45."

## I. Procedural Posture

As stated above, this matter was brought pursuant to Title VII and MHRA. Jurisdiction and venue are proper in this Court.

### A. The Named Plaintiffs

Named plaintiff Lois Jenson began her employment with Eveleth Mines on March 24, 1975. As of the 1992/1993 proceedings, Jenson was on medical leave from Eveleth Mines.

Named plaintiff Patricia Kosmach began her employment with Eveleth Mines on January 21, 1976. As of the 1992/1993 proceedings, Kosmach, who suffers from arterial lateral sclerosis was no longer working at Eveleth Mines.

Named plaintiff Kathleen O'Brien Anderson began her employment with Eveleth Mines on July 6, 1976. As of the 1992/1993 proceedings, Anderson was on medical leave from Eveleth Mines.

Jenson filed a charge of sex discrimination with the Minnesota Department of Human Rights ("MDHR") on October 26, 1984. The charge was also filed with the Equal Employment Opportunity Commission ("EEOC"). On March 7, 1985, the MDHR issued a memorandum stating that there was probable cause to credit Jenson's allegation of unfair discriminatory practice by Eveleth Mines, in violation of MHRA.[7] Jenson received a Right to Sue Notice from the EEOC on August 4, 1988.

Kosmach filed a charge of discrimination with the EEOC on April 13, 1988. Kosmach's charge of discrimination included allegations of class-wide discrimination against female employees and applicants. Kosmach received a Right to Sue Notice from the EEOC on August 4, 1988.

Anderson filed a charge of discrimination with the EEOC on November 11, 1988. Anderson received a Right to Sue Notice from the EEOC on December 8, 1988.

The named plaintiffs are employees within the definition of 42 U.S.C. § 2000e(f), and Minn.Stat. § 363.01, subd. 16.

### B. The Defendants

Defendants Eveleth Taconite Company ("ETCO") and Eveleth Expansion Company ("EXCO") do business under the name Eveleth Mines. Eveleth Mines' labor force is employed by defendant Oglebay Norton Taconite Company ("ONTAC"), a subsidiary of defendant Oglebay Norton Company ("ONCO"), which manages the operation for Eveleth Mines.

The defendant Union is a labor organization representing all of Eveleth Mines' hourly employees.

Eveleth Mines is an employer within the definition of 42 U.S.C. § 2000e(b), and Minn. Stat. § 363.01, subd. 17.

### C. The Litigation

Jenson and Kosmach filed their class action Complaint on August 15, 1988. On March 14, 1989, they filed an Amended Complaint, adding Anderson as a named plaintiff and joining the Union as a defendant.

On December 9, 1991, the named plaintiffs filed a Motion to Amend their Amended Complaint to add claims for compensatory and punitive damages. This Motion was withdrawn on February 3, 1992; it has not been renewed.

A hearing on the named plaintiffs' Motion for Class Certification and a Preliminary Injunction was held in May and June of 1991. On December 16, 1991, this Court[8] certified[9] the plaintiff class to consist of:

---

**7.** On March 24, 1987 the Commissioner of MDHR caused Eveleth Mines to be served with an administrative complaint alleging that it had discriminated against Jenson, Kosmach, and all those similarly situated on the basis of their sex. The complaint further alleged that Eveleth Mines had maintained and continued to maintain a policy of sex discrimination including, but not limited to, a pattern of sexual harassment. Amended Complaint, ¶ 9. The administrative

complaint was dismissed without prejudice upon receiving notice of the named plaintiffs' intent to file a private action.

**8.** Hon. James M. Rosenbaum.

**9.** *Jenson v. Eveleth Taconite Co.,* 139 F.R.D. 657 (D.Minn.1991).

all women who have applied for, or have been employed in hourly positions at Eveleth Mines at any time since December 30, 1983, and who have been, are being, or as the result of the operation of current practices, will be discriminated against with regard to the terms and conditions of their employment because of their sex.

139 F.R.D. at 667. The Court denied the Plaintiffs' request for a preliminary injunction. *Id.*

## II. The Work Place

Eveleth Mines mines and processes crude taconite ore into pellets that are sixty-five percent (65%) iron. These pellets are then sold for purposes of being processed into pig iron and, ultimately, steel.

Eveleth Mines' mining operations are divided between two open pit mines covering 8,600 acres (the "Thunderbird Mine"). Ore from the Thunderbird Mine is uncovered, loaded into trucks and then brought to the "primary crusher," where it is reduced in size. The ore is then transported, by rail, approximately ten miles to Eveleth Mines' processing facility (the "Fairlane Plant"), where it is converted to taconite pellets. The Thunderbird Mine also has a warehouse facility which serves the mining operation.

The Fairlane Plant consists of several large buildings spread out over a large area. When the ore arrives at the Fairlane Plant, it first goes to the "fine crusher" where it is reduced to gravel-sized pieces. Next, the crushed ore proceeds to the "fine ore surge," where it is stored until processing. Beneath the fine ore surge are rows of conveyor belts and hoppers known as "Mexican feeders." [10] The Mexican feeders route the crushed ore

to the "concentrator." The area around the Mexican feeders is known as "Mexico."

In the concentrator, the ore is mixed with water and ground in mills until it reaches the consistency of sand. This powder is then sent over revolving drums containing magnets which capture the iron-bearing grains of ore, thereby separating them from waste rock.[11] The concentrate proceeds to the "pellet plant," where it is rolled in revolving drums and sprayed with a bonding agent to produce pellets approximately one-half inch in diameter. The pellets are then fire-hardened in a kiln. After cooling, the pellets are loaded for rail shipment to Duluth and other destinations.

Quality control is an important component of the production process. To that end, pellets are routinely sampled and analyzed at the Fairlane Plant's laboratory to assure their quality.

During periods relevant to this action, the named plaintiffs and Plaintiffs worked at both the Thunderbird Mine and Fairlane Plant, although the majority of Plaintiffs worked at the Fairlane Plant. Plaintiffs worked in all areas of the Fairlane Plant.

Eveleth Mines's work force consists of both hourly and salaried employees. All of the hourly employees are employed in production-related jobs and work at both the Thunderbird Mine and the Fairlane Plant. The hourly workers are divided into two main areas: (1) Maintenance; and (2) Operations. Maintenance workers are required to have craft or technical training, and work as electricians, mechanics, etc. Operations workers are not required to have any special training or education.[12]

---

10. Apparently, the belts and hoppers are known as "Mexican" feeders because they resemble an upside-down sombrero.

11. The iron-bearing grains of ore are known as "concentrate." The material *not containing iron* is known as "tailings." Tailings are divided into "coarse" and "fine" tailings. Fine tailings are left as slurry and are emptied into tailings ponds located behind the buildings. Coarse tailings are used to form dikes around the tailings ponds.

12. With one exception, Maintenance employees were men. Until 1982, Eveleth Mines had an

apprenticeship program, by which employees could qualify to become Maintenance workers by completing a designed program. When the program was terminated in 1982, one woman had completed a significant portion of the program.

No Maintenance employees were hired from 1982 to 1988. In 1988, Eveleth Mines filled Maintenance positions by hiring individuals who had the requisite education or training. In addition, current employees were permitted to enter Maintenance positions by taking a practical skills test. *No women applied for Maintenance positions* in 1988, nor did any women seek to take the skills test.

Job assignments and pay are controlled by the terms of the Collective Bargaining Agreement ("CBA").[13] (Plfs' Exh. No. 9.) All hourly employees work in specific job classifications, which are based upon the job that the employee performs. Base pay varies by job class; the higher the job class number, the greater the hourly wage paid to an employee. Most Operations workers begin as Laborers, which along with Janitors, are the positions occupying the lowest job classification, Job Class 2.

Most Operations positions are organized into sequences of specific jobs. Gaining entry into a sequence is based solely on an employee's job seniority; of those persons interested in obtaining the position, the person with the earliest job starting date receives the position.[14] (T. Tr., 713.)

Once in a sequence, an employee is assigned a sequence starting date. When an opening occurs in a sequence position other than the bottom position in the sequence, the position is offered to the person in the next lower job class with the earliest sequence starting date. (T. Tr., 714.) If that person accepts the position, that person's former position is offered to the most senior person in the next lower sequence job, and so on. If all sequence employees refuse to advance to an open position, the least senior member of the sequence can be forced into the position.

Sequence employees may decline any and all opportunities to advance in a sequence by "freezing in" to their current positions; that is, when offered a job higher in the sequence, they refuse the position. Both male and female employees choose to "freeze in" and several reasons explain an individual's decision to do so, including an unwillingness to work the job and/or desiring to remain on the same shift.

Until 1975, Eveleth Mines' hourly work force was composed entirely of men. Thereafter, women began to be hired as hourly employees, beginning with those women who headed households. Eventually women were hired without regard to their domestic status. From 1981 through 1990, women comprised from three to five percent (3–5%) of Eveleth Mines' hourly work force.

In the early 1980's the taconite industry experienced a wrenching downturn. Eveleth Mines responded to the industry crisis by closing one of its production lines and laying off a significant portion of its hourly work force. Layoffs were handled according to seniority: those employees who were least senior were laid off first. In some cases, employees with a low job starting date, but with a high sequence starting date, lost their sequence jobs, but were able to remain on the job; they were "demoted" into the general pool of laborers.

The layoff lasted several years. In 1986 and 1987, Eveleth Mines began to recall workers who had been laid off. In 1988, Eveleth Mines, projecting increasing demand for taconite pellets, decided to reopen its shuttered production line. Maintenance workers were hired in 1988 to prepare the facility for production. In 1989, forty-six (46) individuals were hired into the Operations area; all 46 were hired as laborers. Forty-four (44) were men, two (2) were women. No Operations workers were hired between 1989 and 1992.

## III. Claims of Sex Discrimination

### A. Legal Standards

Title VII makes it

an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such person's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). MHRA makes it

an unfair employment practice ... (2) for an employer, because of race, color, creed,

---

13. Under the CBA, work assignments and other terms of employment are controlled by a seniority system; when an employee begins her employment, she is assigned a job starting date.

14. For jobs not located in a sequence and jobs at the bottom of a sequence, job openings are post-

ed for seven days. During that period, those persons interested in obtaining the position sign a "bid sheet" and submit it for consideration. At the end of the seven days, the assignment is made. Job openings within a sequence are not posted.

religion, national origin, [or] sex ... to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

Minn.Stat. § 363.03, subd. 1(2)(c).

■ In an employment discrimination case tried as a class action, the burden of proof in a class action differs from cases involving individual plaintiffs. A class of plaintiffs must establish by a preponderance of the evidence that the defendant engaged in a "pattern or practice of unlawful discrimination in various company policies." [15] *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir.1984). A pattern or practice is present when "the discriminatory acts were not isolated, insignificant or sporadic, but were repeated, routine, or of a generalized nature." *Catlett v. Missouri Highway and Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir, 1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988); in other words, "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." [16] *International B'hood of Teamsters v. United States*, 431 U.S. 324, 360–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977).

■ In the "ordinary" case, the plaintiff class will produce statistical proof as circumstantial evidence showing some disparity between similarly situated protected and unprotected employees with respect to some term or condition of employment.[17] The statistical proof usually is supplemented with other evidence, such as testimony about specific incidents of discrimination. Although statistical evidence is most common, evidence of specific incidents of discrimination, where available, is important; it may bring "cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856. Either type of proof alone may be sufficient to establish a pattern or practice of discrimination. *Catlett v. Missouri Highway and Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir.1987).

In rebuttal, the defendant employer will attempt to show that the plaintiff class' "proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 361, 97 S.Ct. at 1867. If the defendant fails, the "trial court may then conclude that a violation has occurred and determine the appropriate remedy." [18] *Teamsters*, 431 U.S. at 361, 97 S.Ct. at 1867.

■ Class action discrimination claims can be brought under either of two theories—disparate treatment or disparate impact—or both.[19] In a "disparate treatment" case, the plaintiff claims the existence of a disparity between men and women in selection rates for a particular job or job benefit and further claims that the disparity is due to unlawful bias against women. *See Palmer v. Schultz*, 815 F.2d 84, 980 (D.C.Cir.1987). Sometimes the disparity is expressed as the difference

---

15. Liability for employment discrimination under the MHRA is interpreted with reference to Title VII. *Danz v. Jones*, 263 N.W.2d 395, 398–99 (Minn.1978). Accordingly, the discussion of liability for sexual discrimination under the MHRA will be subsumed in the discussion of liability under Title VII.

16. The language "pattern or practice" was not intended as a word of art, and the words reflect only their usual meaning. *Teamsters*, 431 U.S. 336 n. 16, 97 S.Ct. at 1855 n. 16 (quoting statement of Senator Humphrey during consideration of Title VII).

17. To be of value, however, statistical evidence must reflect "valid comparisons of similarly situated people." *Holden v. Burlington Northern, Inc.*, 665 F.Supp. 1398, 1409 (D.Minn.1987). If the factual bases of the statistical conclusions are faulty or suspect, the conclusions themselves are of little utility.

18. If a pattern or practice of discrimination is established, the plaintiff class is entitled to appropriate prospective relief. In addition, a prima facie case is made out with regard to the recovery phase of the action, in which individuals' right to relief is determined. *Craik*, 731 F.2d at 470. At the recovery phase, the court presumes that the employer unlawfully discriminated against individual members of the plaintiff class; the defendant has the burden of persuasion and must show by a preponderance of the evidence that it did not unlawfully discriminate against the specific class member seeking relief. *Id.*

19. With the sole exception of their claim of discrimination in hiring, Plaintiffs have not specified whether their individual claims are brought under either "disparate treatment" or "disparate impact" theories, or both. The hiring claim is premised on both theories.

between the number of women actually selected and the number of women "one would expect to have been selected, assuming equality in selection rates for men and women." *Id.* at 90.

■ If a disparity is found, proof that the disparity was caused by discriminatory animus can be shown by direct or circumstantial evidence. Two types of circumstantial proof may be relied upon: (1) statistical evidence; and (2) anecdotal evidence of incidents of discrimination. Each may alone justify an inference of discriminatory animus, *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, putting the burden on the defendant to rebut the proof. However, unless statistical proof shows that the disparity is "gross," *Hazlewood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), anecdotal evidence of discrimination will be an essential teammate in establishing a pattern or practice of disparate treatment.[20] 2 Arthur Larson & Lex K. Larson, *Employment Discrimination*, § 50.-83(a), at 10–138 (1993) [hereinafter *Larson*].

■ Statistical proof relevant to determining whether a disparity resulted from discriminatory animus seeks to establish the *probability* that a disparity was "merely a random deviation from perfectly equal selection rates." *Palmer*, 815 F.2d at 91. However, even where statistical proof establishes the probability that a disparity was not caused by chance, it cannot determine whether discriminatory animus more likely than not caused the disparity. This is the difference between statistical proof and "legal proof": the latter is the burden carried by parties to litigation and is the object of a

court's analysis, whereas the former is a tool to be used in determining whether the plaintiff has established the necessary legal proof.[21]

■ In this case, Plaintiffs asserted that disparities greater than two standard deviations[22] would indicate that the disparity between men and women was caused by factors other than chance. *See Palmer*, 815 F.2d at 96. The Court finds that focusing on disparities of a magnitude approaching two standard deviations is appropriate. However, this measure is not an "automatic" threshold for liability; rather, it is a trigger point at which an inference of discrimination may, but need not, be justified:

> [s]tatistical evidence showing less marked discrepancies [than two or three standard deviations] will not alone establish that something other than chance is causing the result, but we shall consider it in conjunction with all relevant evidence in determining whether the discrepancies were due to unlawful discrimination.

*Craik*, 731 F.2d at 476 n. 13; *see Palmer*, 815 F.2d at 97 n. 10 (following *Craik*). As was noted *supra*, "the issue for the trier of fact . . . is whether the totality of plaintiff's evidence (again including the evidence of the disparity itself) demonstrates that, more likely than not, the disparity resulted from an unlawful discriminatory animus." *Palmer*, 815 F.2d at 96–97.

■ Claims of "disparate impact" involve employment practices that are facially neutral in their treatment of different groups, but which in fact have adverse effects which disproportionately fall on one group and cannot be justified by business necessity.[23]

---

20. The Supreme Court, in *Hazlewood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), stated that "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern and practice of discrimination." *Id.* at 307–08, 97 S.Ct. at 2741. Accordingly, except in cases where statistical proof shows a wide disparity of treatment, claims of disparate treatment will usually require both statistical and anecdotal proof.

21. For an excellent discussion of the use and role of statistics in Title VII disparate treatment cases, see *Palmer*, 815 F.2d at 90–101.

22. A "standard deviation" is a measure of spread, dispersion, or variability of a group of numbers from the expected results.

23. MHRA specifically defines the shifting burden of proof which accompanies claims of discrimination resulting from disparate impact. Minn. Stat. § 363.03, subd. 11. However, when deciding claims based upon disparate impact theories, Minnesota courts have followed federal court decisions applying Title VII. *See e.g., Schlemmer v. Farmers Union Cent. Exchange*, 397 N.W.2d 903, 908 (Minn.Ct.App.1986).

*Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–55 n. 15. In disparate impact analysis, proof of discriminatory motive is not required; the focus is on consequences of employment practices, not motivations. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). Accordingly, statistical analysis is more central to claims of disparate impact discrimination, without regard to whether anecdotal evidence is presented. *Larson,* § 50.84, at 10–142.2. Statistical concerns relevant to the disparate treatment theory of recovery are substantially similar to those raised in the foregoing discussion of disparate impact theory.

### B. Specific Claims [24]

#### 1. hiring

The Plaintiffs' hiring claim is based on a period of hiring which occurred from May through September, 1989, during which period Eveleth Mines hired 46 hourly workers, all as laborers. Those hires were made from review of 274 applications and resumes, 25 of which were submitted by women; 259 were submitted by men. Eveleth Mines made offers to three women, two of which were accepted.[25] It is not clear how many men were offered employment and how many rejected the offers, but 44 men accepted laborer positions.

Initially, the Court notes and rejects Eveleth Mines' argument that Plaintiffs' claim of discrimination in hiring is outside the scope of this action. Although the Amended Complaint was filed on March 14, 1989, some two months prior to the commencement of the hiring period, Plaintiffs' claims of discrimination include alleged acts of discrimination occurring subsequent to the date on which the Amended Complaint was filed. Moreover, the Court does not agree with Eveleth Mines argument that permitting Plaintiffs to press their hiring claims will encourage future litigants to broadly word a complaint in the hopes that later events will provide factual support for their allegations. The Court believes that Fed.R.Civ.P. 8 and 11 provide sufficient protection against abusive and improper pleadings.

#### a. disparate treatment

To support their claim of discrimination based upon disparate treatment, Plaintiffs offered the expert testimony of Dr. Rebecca Klem.[26] In May of 1991, Dr. Klem presented statistical evidence of female availability or interest in laborer positions.[27] This proof

---

**24.** At this stage of the litigation, the Court has heard all of the evidence in the case and has denied the defendants' motions for judgment as a matter of law. Accordingly, the focus herein will be on the essential factual question: whether Eveleth Mines has engaged in a pattern or practice of discrimination on the basis of sex. *See United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citation omitted). Concerns about whether Plaintiffs established a prima facie case of discrimination, thereby putting the burden of production on Eveleth Mines, *see Teamsters,* 431 U.S. at 360–61, 97 S.Ct. at 1867, thus are no longer relevant. *Wolff v. Berkley, Inc.,* 938 F.2d 100, 103 n. 3 (8th Cir.1991).

**25.** Eveleth Mines' former Director of Human Resources, Jay Henningsgard, made all relevant hiring decisions in 1989. Henningsgard testified that he recalled offering employment to Lynette Forness. Ms. Forness denied ever receiving an offer of employment. Although both witnesses were credible, the evidence was insufficient to establish that such an offer was made. It was undisputed that Rose Otis Benz, Angel Smith Alaspa, and Georgiana Forness were offered employment. Benz and Smith Alaspa accepted the

offers, whereas Georgiana Forness asked Henningsgard to give the job to her son. Although Plaintiffs contend that Forness did not "reject" the offer, the Court finds that she did reject the offer.

**26.** Dr. Klem has her Ph.D. in statistics from Iowa State University and is a principal in a statistical consulting firm located in Washington D.C. (T. Tr., 1338.) Dr. Klem provides expert testimony in the area of employment discrimination on behalf of both plaintiffs and defendants. (T. Tr., 1338–40.) Dr. Klem testified at both the 1991 and the 1992/1993 portions of the trial in this matter. This Court accepted her as an expert witness without objection. (III, at 2.)

**27.** Dr. Klem performed a "probability analysis" measure. In such a measure, it is assumed that all members of a population have an equal probability of being selected. Calculations are then performed to compare the expected number of selections of a given population with the number actually selected. Where there is a deficit in the actual versus expected number selected, statistical analysis, usually expressed in units of standard deviation, measures the extent to which the disparity in the number selected was the result of

took two forms. First, Dr. Klem presented applicant-flow data, which was based upon her analysis of the 274 applications which Eveleth Mines' former Director of Human Resources, Jay Henningsgard, reviewed during the course of the relevant hiring period. Dr. Klem's analysis indicated that women represented 17.2% of the laborer applicants. Dr. Klem arrived at this calculation by counting the number of applicants who had listed "laborer" or some derivative thereof as their *first* choice of jobs.[28] The 17.2% availability of women resulted in an expectancy that 8.1 of the 47 laborers hired would be women.[29] The hiring of two women thus created a disparity of 6.1 female hires. Dr. Klem concluded that the standard deviation of the disparity of females hires was 2.55, which exceeded the two standard deviations threshold and indicated to Dr. Klem that women were not hired for reasons other than chance, that is, the percentage of their availability in the applicant pool.

Dr. Klem also conducted an analysis of female availability based upon comparative work-force data, which was compiled from 1980 census data.[30] Dr. Klem proposed that the relevant labor market for laborer jobs consisted of individuals employed as laborers, excluding construction, plus the unemployed. She calculated the availability of this population in three separate geographical areas: (1) five counties surrounding Eveleth Mines; (2) nine cities surrounding Eveleth Mines; and

(3) St. Louis County, Minnesota. (Plfs' Exh. No. 72, 73a, 73b.)[31]

Based upon the comparative work-force data, Dr. Klem testified that the female availability rate in each of the three relevant labor markets was greater than the 17.2% figure resulting from the applicant-flow data.[32] Accordingly, the expected number of female hires was higher for each of the labor markets than the applicant flow data, as was the standard deviation of disparity in hiring of females. The standard deviations were 3.26, 3.82, and 3.61, respectively.

In February 1993, Dr. Klem refined the applicant-flow data and updated one aspect of the comparative work-force data. For the applicant-flow data, Dr. Klem testified that she had examined all the applications which Eveleth Mines had produced during discovery and gathered all applications which had been submitted between May 15, 1989 and September 25, 1989—the relevant hiring period. She then divided those applications into two Pools. In Pool I, Dr. Klem placed all applications on which an applicant had listed "laborer" or some derivative thereof as the first choice for jobs.[33] In Pool II, Dr. Klem placed all applications in which an applicant had listed some derivative of "laborer" or had listed "anything" as the first job choice. (T. Tr., 1383–84; Plfs' Exh. 274.) Dr. Klem testified that the standard deviation of the disparity between male and fe-

chance, that is, was caused by the populations's representation, or was caused by some other factor or factors.

28. Dr. Klem did not count any applications in which "laborer" was listed as the second or third job choice.

29. In 1991, Dr. Klem used a figure of 47 laborer hires, one of whom was a woman. In 1993, she agreed that the proper figures were 46 laborer hires, two of whom were women; the difference is not material.

30. Dr. Klem provided the work-force data because she had been told that the hiring process lacked standards for advertising job openings— Eveleth Mines relied on word-of-mouth advertising—as well as in accepting, processing, and reviewing applications. (T. Tr., 1391.)

31. For the work-force data based upon census information from the nine-city geographic area, Dr. Klem did not exclude construction laborers

from her availability calculations; the census data for that area did not provide the number of persons working as construction workers. (T. Tr., 1452.)

32. For the five-county area, the availability rate was 23.3%. For the nine city area, the availability rate was 28.3%. For the St. Louis County area, the availability rate was 26.4%.

33. Focusing on whether "laborer" was the first job choice was the same method that Dr. Klem presented to the Court in 1991. The difference between the two data sets is that the 1991 analysis examined only the 274 applications which Henningsgard reviewed during the hiring process, whereas the 1993 analysis examined any application produced by Eveleth Mines during discovery. Although the data base was different, the availability percentage did not change: it remained 17.2%.

male hires was 2.11 for Pool I and 2.13 for Pool II.

Dr. Klem updated the comparative workforce data from the five-county surrounding area by adding figures from the 1990 census and refining the figures from the 1980 census. (T. Tr., 1445–46; Plfs' Exh. No. 275.) Based upon 1990 census data, Dr. Klem stated that female availability in the relevant job market was 30.98%, and the standard deviation of the disparity in hiring females was 3.75 standard deviations. (Plfs' Exh. No. 275.)

Plaintiffs presented several incidents of anecdotal evidence of discrimination.[34] Two women testified that they had sought applications during the hiring period and were told that Eveleth Mines was not hiring and that applications were not being taken. One of the women received an application after informing the person that her father was a salaried employee. Plaintiffs also provided testimony that (1) in years past, Eveleth Mines' manager in charge of personnel had stated that women "did not belong in the mines", (2) that person and other personnel employees told sexist jokes and made other sexist statements, and (3) Henningsgard pro-

vided inconsistent testimony as to the criteria he applied in hiring laborers.[35]

In rebuttal, Eveleth Mines' expert, Dr. Donald McCaughren,[36] presented applicant-flow data based upon the 274 applications which were Henningsgard reviewed during the hiring process. Dr. McCaughren determined that 9.1% of the applicants were women, thereby making the expected number of female hires 4.19. The resulting disparity in hiring of women was 2.19 and the standard deviation of the disparity in hiring was 1.12 standard deviations.

■ A selection process that is subjective and dominated by men "requires particularly close scrutiny." *Craik*, 731 F.2d at 474. Such a hiring process may account not only for women's failure to be selected, it may also account for women's failure to apply for or otherwise seek consideration. *See id.; cf. Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). Such a process is not, however, a per se violation of Title VII.

■ The Court finds that Dr. Klem's applicant-flow data is not credible evidence of discrimination.[37] The factual basis for Dr. Klem's analysis was the applicants' job choice. However, counting only those appli-

**34.** Dr. Eugene Borgida appeared as an expert witness on Plaintiffs' behalf to testify on the subject of sexual stereotyping. The Court accepted Dr. Borgida as an expert in sexual stereotyping. Although Dr. Borgida's evidence is relevant to Plaintiffs' claims of sexual harassment, *see infra*, Part IV.D.2, the Court finds that Dr. Borgida's testimony, although also relevant to whether Eveleth Mines engaged in a pattern or practice of discrimination on the basis of sex in hiring, job assignments and upgrades, compensation or training, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989), does not advance Plaintiffs' claims of discrimination in these areas. It was undisputed that Dr. Borgida could not tie the existence of sexual stereotypes regarding women to any individual employment policy or decision, even though he opined that sex stereotyping affected all decisions at Eveleth Mines. (*See* T. Tr., 517); *cf. Price Waterhouse*, 490 U.S. at 256, 109 S.Ct. at 1794; *id.* at 277–78, 109 S.Ct. at 1804–05 (O'Connor, J., concurring).

**35.** At various times, Henningsgard testified that he looked only to whether an applicant had a family member or friend who worked at Eveleth Mines, that he looked only for technical training

or skills and/or previous mine experience, and that he looked for skills and experience for some of the 46 positions, but that for the majority of positions he considered whether an applicant was a relative or friend of Eveleth Mines employees.

**36.** Dr. McCaughren is the Director of the International Pacific Halibut Commission. He received his Ph.D in biometrics from Cornell University and has spent several years studying and teaching statistical models at the University of Washington. (T. Tr., 1023, 1025.) He was accepted as an expert on statistical evidence. (VI, 43.)

**37.** It is accepted that conjecture and assertions are insufficient to topple any inferences supported by a plaintiff's statistical proof. *See Bazemore v. Friday*, 478 U.S. 385, 400–01 n. 10, 106 S.Ct. 3000, 3009 n. 10, 92 L.Ed.2d 315 (1986). Eveleth Mines' evidence in opposition to Dr. Klem's probability analysis surpassed mere assertions or conjecture. Eveleth Mines was required to and did present credible evidence in support of its contention that Plaintiffs' statistical analysis was flawed and that the flaws materially biased the results.

cations where "laborer" or "anything" was an applicant's *first* choice of jobs unduly limited the relevant population of available applicants. Dr. Klem testified that she was conducting an "availability" analysis; there is nothing in the record which would support a conclusion that availability should be determined by counting an applicant's first choice.[38] Moreover, the record indicates that all applicants were considered for laborer positions regardless of their first job choice.

Having rejected Plaintiffs' applicant-flow data, the Court is left with Eveleth Mines' applicant-flow data and Plaintiffs' comparative work-force data as statistical proof of discrimination in hiring. Both share the positive characteristic of relying on women's presence as a measure of availability, and not some artificial selection device such as preferred job choice. In addition, the Court recognizes the risk of relying on applicant-flow data where the hiring process is subjective or less than standardized. Moreover, the Court recognizes the fact that the standard deviations of disparity present in each of the two measures are on opposite sides of the two standard deviations mark.

■ Nevertheless, the Court credits Eveleth Mines' applicant-flow data as the more relevant and reliable statistical proof. The Court finds that Plaintiffs' comparative work-force data, although a proper measure of availability, *see Hazlewood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13, created a materially false view of women's availability for laborer positions. By including unemployed individuals in the work-force data, Dr.

Klem unduly relied on the fact of unemployment. Availability is a measure of interest in a position, (T. Tr., 1453), and general work-force data is helpful to courts only if it indicates some measure of *interest. See EEOC v. Chicago Miniature Lamp Works,* 947 F.2d 292, 302 (7th Cir.1991). Merely being unemployed does not, in any real sense, make one "available" for employment as a laborer at Eveleth Mines, even though the laborer position is an unskilled, entry-level position. It was undisputed that laborers perform physically-demanding tasks and do so in a variety of conditions. Dr. Klem's unemployment figures, which include the unemployed from any job, subordinate the role of interest in working as a laborer in a physically challenging environment to the status of needing a job.[39] Because the Court cannot determine how excluding the unemployed would have affected Plaintiffs' work-force data, the Court cannot draw conclusions about female availability in the relevant work-force without regard to the unemployed. Accordingly, the Court must reject this area of proof.

■ The Court finds Dr. McCaughren's applicant-flow data to be credible statistical proof of the significance of the disparities in hiring female laborers.[40] The weight of the evidence establishes that Henningsgard reviewed 274 applications during the May 1989 through September 1989 hiring period. Testimony that one woman did not receive an application does not warrant a conclusion that the applications reviewed by

**38.** In addition, Dr. Klem testified that 17.3%, or 58.99 of the Pool II applications were filled out by females. Her calculation, however, was contradicted by Plaintiffs' evidence that only 35 women applied for laborer positions during that period. (Plfs' Exh. No. 260, 263.) In addition, some of the applications contained in Plaintiffs' Exhibit No. 260 do not show "laborer" or "anything" as the applicants' first job choice. Therefore, some of the applications in Exhibit No. 260 would not have been included in Dr. Klem's pool of 58 female applicants.

**39.** For similar reasons, Dr. Klem's choice to exclude construction laborers from her comparative work-force data was, in this Court's view, in error. Given the wide variety of jobs that go into being a "laborer" in general, laborers at Eveleth Mines and construction laborers likely engage in

similar tasks and use similar skills. It is unknown what effect including construction laborers would have had on Plaintiffs' work-force data, but doing so would have increased the utility of Plaintiffs' comparative work-force measures.

**40.** Where, as here, reliable evidence of female availability is not available through use of general labor market statistics, available and competent applicant-flow data is "very relevant" proof of patterns or practices of discrimination. *Hazlewood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13; *see Dothard,* 433 U.S. at 330, 97 S.Ct. at 2727; *cf Wards Cove,* 490 U.S. at 649–50, 109 S.Ct. at 2121 (discussing relationship between applicant-flow data and comparative work-force data).

Henningsgard inaccurately reflect the available female labor pool.[41] *See Dothard*, 433 U.S. at 330, 97 S.Ct. at 2727. The same is true for the evidence of ten applications submitted by women which contain dates within the hiring period. (Plfs' Exh. No. 263.) Plaintiffs did not establish that those applications actually could have been considered by Henningsgard during the hiring period.

As was discussed *supra*, the standard deviation of the disparity in female hiring was 1.12. Accordingly, under *Craik*, the disparity of female hires alone does not support an inference that women were not hired for reasons other than their representation in the applicant pool.[42]

 The Court also concludes that Plaintiffs' anecdotal evidence of discrimination, when considered in light of the lack of statistical proof of discrimination, did not establish by a preponderance of the evidence a pattern or practice of discriminating against women in hiring. The relative absence of testimony concerning specific instances of discrimination is consistent with the relatively weak statistical proof. In addition, Plaintiffs' references to Eveleth Mines' reliance on word-of-mouth advertising and subjective criteria does not make Eveleth Mines' hiring practices discriminatory.[43] Rather, they are consid-

ered with the other facts and circumstances of the case. *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 332 (7th Cir.1988). The Court views the alleged statements by Eveleth Mines' personnel employees in the same vein.[44] In this case, this evidence does not support a finding of disparate treatment.

### b. disparate impact

Under a disparate impact theory, "plaintiff is . . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989) (citation omitted). Plaintiffs have identified Eveleth Mines' reliance on word-of-mouth hiring, nepotism, and a "sloppy system for accepting and retaining applications" as the facially neutral policies which discriminate against women. (Plfs' Post–Trial Brief, at 29.)

 The Court has concluded that Plaintiffs failed to offer statistical proof showing a meaningful disparity in hiring women for purposes of their disparate treatment theory of recovery.[45] Because Plaintiffs have relied on this same proof for their disparate impact theory, the Court concludes that Plaintiffs have not established class-wide

---

**41.** The Court finds that the relevant population from which to establish and evaluate any disparities in hiring is the set of 274 applications which were reviewed by Henningsgard in making his employment decisions. Although male-dominated hiring processes may have the effect of discouraging women from applying for positions, there was no evidence on which to conclude that Eveleth Mines' process had that affect; women *in fact applied for work.*

**42.** At the December, 1992 trial proceedings, Dr. McCaughren offered an availability analysis of two other sets of applications that had been provided to him: (1) 376 applications that had been given to him by Henningsgard; and (2) 659 applications that had been produced during discovery. Although these application sets are not the relevant population of applicants for purposes of examining disparities in hiring women, the Court notes that the standard deviation of the disparity for the 376 application population, .62 standard deviations, is less than that for the 274 application population. (T. Tr., 1033.) The same is true for the 659 application population, which has a standard deviation of the disparity of female hires of .7 (T. Tr., 1035.)

**43.** Specifically, although Plaintiffs contend that Henningsgard changed his testimony concerning the criteria he applied when making his 1989 hiring decisions, the only real change in his testimony was that he testified for the first time in 1992 that he actually filled 14 of the 46 laborer positions by considering applicants' craft skills or operator equipment experience. By examining the parties' statistical proof in light of 46 laborer hires, the Court has not credited this testimony.

**44.** Robert Raich's statements that women did not belong in the mines, as well as his conduct toward women generally, are objectionable. However, Raich was not involved in the 1989 hiring of laborers; Henningsgard had complete responsibility for this task. Although Plaintiffs have attempted to taint Henningsgard's hiring decisions with evidence of Raich's presence at Eveleth Mines and his review of Henningsgard's performance, the Court finds that Plaintiffs have failed to make the required showing.

**45.** *See supra,* Part III.B.1.

liability on the basis of a disparate impact analysis.[46]

In summary, the evidence in this case shows that Plaintiffs have failed to meet their burden of establishing by a preponderance of the evidence a pattern or practice of sex discrimination in Eveleth Mines' hiring practices during 1989, under either a disparate treatment or disparate impact analysis.

### 2. promotions

The focus of Plaintiffs' claim of sex discrimination in Eveleth Mines' promotional practices is the promotion of hourly employees to "step-up foreman" and "foreman." Step-up foremen are hourly employees who are given supervisory responsibility over a crew for temporary periods of time. Foremen are permanent salaried management employees, almost all of whom were hourly employees prior to being promoted.

Step-up foremen must come from the work crew whose foreman is absent. Step-up foremen receive a pay premium over their regular hourly wage and have all the duties of a foreman, except that they may not discipline hourly employees. Under the terms of the CBA, Eveleth Mines must designate the persons who it will consider for step-up foreman and may designate only a certain number of potential nominees. However, there is no limit on who Eveleth Mines places on the list or on the number of times Eveleth Mines changes the list of names.[47]

Until as recently as 1988, there was no specific procedure for selecting foremen; as with step-up foremen, hourly employees were simply approached by management and asked about their desire to become foreman. Openings were not posted and there was no attempt to make the job available to employees on a company-wide basis. It was clear, however, that having been a step-up foreman was a virtual prerequisite for being promoted to foreman: almost every foreman at Eveleth Mines had been a step-up foreman at one time.

No promotions to foreman occurred from 1982 to 1988. Only three persons were promoted to step-up foreman between 1982 and 1989; those individuals worked approximately 240 hours as step-up foreman. During those years, foreman needs were met by current foremen through overtime and other arrangements.

In support of Plaintiffs' claim, Dr. Klem devised a different probability sampling analysis, the results of which showed a disparity in promotions of women to step-up foreman.[48] Dr. Klem first derived the number of women who were available for promotion to step-up foreman, basing her calculation upon the percentage of women in Eveleth Mines' Operations hourly work force—their presence in the work force—and based upon the number of "step-up weeks" per year.[49]

46. The Court notes, however, that each of the three hiring practices have elsewhere been identified as employment practices that can give rise to claims of disparate impact discrimination. *See EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 305 (7th Cir.1991) (active word-of-mouth advertising); *Thomas v. Washington County School Bd.*, 915 F.2d 922, 925 (4th Cir. 1990); *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 n. 7 (11th Cir.1990) (nepotism). However, none of them will always have a disparate impact on a protected group; each turns on the unique employment situation at issue.

Moreover, with regard to word-of-mouth hiring, the Court notes with favor the Seventh Circuit's distinction between word-of-mouth hiring that results from an employer's affirmative communication to its employees that they should recommend applicants for entry-level positions, and that which results from the employer merely accepting applicants who learn of openings from employees. *Chicago Miniature*, 947 F.2d at 305. In the latter situation, the employees, rather than

the employer, take the active role in recruiting. An employer's passive reliance on employees' actions is not the type of "affirmative act" that can result in disparate impact liability. *Id.*

In this case, the evidence indicates that applicants heard about jobs from family members or friends who were employees at Eveleth Mines. The evidence did not indicate that Eveleth Mines actually told their employees to direct people to apply for laborer positions.

47. For example, in a given department, the CBA may limit the number of step-up nominees to six. Eveleth Mines must limit its nominees to six and must disclose the names of the six individuals; however, Eveleth Mines may change the list of six names as often as it wishes.

48. No statistical proof was offered with regard to promotions to foreman.

49. "Step-up weeks" is an artificial calculation Dr. Klem arrived at by dividing the total number

No woman has ever been promoted to step-up foreman at Eveleth Mines. Accordingly, Dr. Klem next calculated the disparity between the actual number of step-up weeks worked annually by women—0—and the expected number of female step-up weeks. Between 1984 and 1982, the standard deviation of the disparity was 4.79.[50]

Eveleth Mines limited its rebuttal to challenging the assumptions underlying Dr. Klem's statistical proof; it did not offer its own statistical proof concerning promotion to step-up foreman and foreman.[51]

The presence of a "0" looms large and indicates that Eveleth Mines' promotion practices have at least a disparate impact on women. However, the Court is troubled by the proof which has been offered in support of Plaintiffs' claim of class-wide discrimination. First, Plaintiffs failed to offer proof of specific instances in which women were discriminated against in promotions to step-up foreman. Two women did testify that they wanted to be step-up foreman and that they believed that they were qualified, but this is not evidence of unlawful discrimination; it is merely proof of interest and perceived qualifications.[52] Accordingly, Plaintiffs' statistical proof is critical to establishing the presence of a pattern or practice of discrimination.

Second, cross-examination of Dr. Klem revealed that her statistical proof was premised on an assumption that all women, indeed all men, employed as hourly Operations employees were available for promotion to step-up foreman. Dr. Klem further assumed that there were no special qualifications for the position, either in terms of skills or job classification. That is, her measure of availability assumed that all employees were similarly situated.

The evidence showed that these assumptions were erroneous. It is undisputed that step-up foremen are usually employees in the higher levels of a job sequence and that they are almost always trained on all the jobs in the sequence. (T. Tr., 725.) In other words, an employee's job classification and position in a sequence, as well as the employee's general work experience, are relevant criteria. It cannot be gainsaid that all female employees are not similarly situated in these areas. Because Dr. Klem's analysis ignored these relevant non-discriminatory differences between female hourly employees, her measure of female availability is not a reliable measure of the number of females who could be expected to be appointed to step-up foreman. Plaintiffs' statistical proof, therefore, must be rejected; thus, there is no *statistical* evidence that the disparity in female promotions is due to discriminatory animus.

of hours in which Eveleth Mines' employees worked as step-up foremen in a given year by 40, the number of hours in an average work week. For example, in 1989, the total number of step-up hours was 5,146.7, (Plfs' Exh. No. 266), and the number of step-up weeks was 129. (Plfs' Exh. No. 268a).

50. Dr. Klem also presented evidence of the disparity between 1981 and 1992, the standard deviation of which was 7.18. The standard deviation for 1981–1992 is much greater than that for 1984–1992 because a great number of step-up weeks were worked in 1981 and 1982. The sole value of the 1981–1992 standard deviation is to illustrate the negative impact on women as the number of promotions to step-up foreman increases.

51. Dr. McCaughren testified that in his opinion, statistical analysis could not be performed on promotions to step-up foreman. (T. Tr., 1037–38.) Dr. McCaughren testified that probability sampling could be performed only where people have an equal chance of being selected. Because the criteria applied to choosing step-up foremen creates an unequal chance of being selected, he continued, the process was not amenable to statistical analysis. *Id.*

52. A closer case is Jan Wollin's testimony that she expressed an interest in being promoted to step-up foreman and that John Niemi, her General Foreman, told her "January, you know you know you got foreman potential ... If there ever were to be a woman foreman made in the concentrator, I would make sure it would be you." (T. Tr., 170.) This statement is not an incident of discrimination, as no promotion decision was made; however, it is evidence of discriminatory animus toward women.

Relatedly, Joan Hunholz, a female hourly employee, testified that both she and another woman were offered, but declined, step-up foreman positions on the laborer crew at the pellet plant. (VI, 114–15.) That two women were offered step-up foreman positions does not, however, disprove Plaintiffs' claim of discrimination in promotions to step-up foreman.

As a result, the Court is left with one piece of Plaintiffs' proof: the "inexorable zero." *Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858 n. 23. No amount of wrangling can change the *numerical* evidence of disparity which the zero illustrates. However, in spite of the zero, Eveleth Mines sought to prove that its failure to promote women to step-up foreman was not caused by either an employment policy or discriminatory intent; rather, the disparity is caused by unrelated factors, specifically that few women had the training or experience necessary to be considered for step-up foreman and those that did either were not interested in the position,[53] or were not "right" for it.

 These proffered explanations are insufficient to rebut Plaintiffs' evidence of discrimination. Employment actions utilizing subjective decisional criteria can be examined under a disparate impact theory. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991, 108 S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988). Further, disparate impact theory does not require proof of motive; rather, it only requires that a facially neutral practice be shown to have a disparate impact on women.

Assuming *arguendo*, that its failure to promote any women to step-up foreman alone justifies an inference that Eveleth Mines' promotion policies have a disproportionate impact on women, Eveleth Mines presented evidence attempting to show that its promotion policy is job-related. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 426, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). Eveleth Mines personnel testified that knowledge and experience in the sequence are critical to success as a step-up foreman. Eveleth Mines presented other evidence that the dearth of qualified women was caused by the nature of the seniority system mandated by the CBA, the fact that advancing through sequences is controlled by seniority, and personal choice, that is the ability to "freeze-in"

to a position. Choosing to ignore the subjective, and hence suspicious criteria of "attitude" and "interest," Eveleth Mines concluded that the job-related qualifications to be a step-up foreman reasonably explain why women, who made a later entry into Eveleth Mines' work force, have not been promoted to step-up foremen.

 The Court finds that Eveleth Mines has failed to show that its promotion policy is justified. Qualifications for step-up foreman are not dictated by the seniority system or the CBA. Accordingly, anyone who satisfies Eveleth Mines' criteria may be promoted. However, as discussed *supra*, Eveleth Mines' management personnel make promotions to step-up foreman by applying subjective criteria. Two of those criteria, "attitude" and "interest," are, in light of the sexual stereotypes existing at Eveleth Mines, likely causes of the disparity in promoting women to step-up foremen.[54] *See Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 321 (N.D.Cal.1992). In addition, the other criteria—an employee's *knowledge* of the jobs in the sequence and the *ability* to perform those jobs—also involve a degree of subjectivity which precludes those criteria from serving "in a significant way, the legitimate employment goals" of Eveleth Mines. *Wards Cove*, 490 U.S. at 432, 109 S.Ct. at 2115. The simple fact is that female sequence employees can be identified as potential step-up foremen and given the training needed to prepare them to perform effectively. Eveleth Mines' foremen and management personnel actively identify male hourly employees who "have the right stuff," but do not attempt to identify similar female hourly employees. Accordingly, Eveleth Mines has not presented a meaningful justification for the disparate impact worked by its promotion policies.

 The Court concludes that Plaintiffs have established that Eveleth Mines' practice

---

53. Of course, the fact that no woman has ever been promoted to step-up foreman may explain why women have not shown any interest in the position. *See Craik*, 731 F.2d at 474.

54. The Court notes that the use of ambiguous and subjective criteria is a precondition to sexual stereotyping of women. *See infra*, Part IV.D.2.a.

Accordingly, Dr. Borgida's testimony provides confirmatory evidence for the Court's conclusion that the Eveleth Mines' use of subjective criteria in making promotion decisions is a causal factor of the absence of female promotions to step-up foreman.

of promotions to step-up foreman, which is based upon subjective and ambiguous selection criteria has a disparate impact on women. The Court further concludes that Eveleth Mines' use of subjective and ambiguous criteria for making promotions to step-up foreman, when combined with Eveleth Mines' knowledge that women were underrepresented in step-up positions, constitutes proof of discriminatory intent sufficient to support a conclusion that Plaintiffs have proven discriminatory intent beyond a preponderance of the evidence. *See Jauregui v. Glendale,* 852 F.2d 1128, 1136 (9th Cir.1988); *Stender,* 803 F.Supp. at 332–333. Plaintiffs, therefore, have also established disparate treatment in promotions to step-up foreman.[55]

For all intents and purposes, Plaintiffs' claim of discrimination in promotion to foreman was tied to their claim of discrimination in promotion to step-up foreman. As was the case with promotions to step-up foreman, no women have been promoted to foreman. However, as with promotions to step-up foreman, the "inexorable zero" is strong proof of, but does not mandate a conclusion that, Eveleth Mines discriminated against women in making promotions to foreman; the burden remained on Plaintiffs to establish a pattern and practice of discrimination, either through disparate treatment or disparate impact.

As discussed *supra,* previous experience as a step-up foreman is critical to being considered for promotion to foreman. Accordingly, the Court also concludes that Eveleth Mines' practice of making promotions to foreman discriminated against females; by tying pro-

motions to foreman to step-up foreman experience, Eveleth Mines tainted its promotions to foreman with the sex-bias evident in its promotions to step-up foreman.

In summary, Plaintiffs have established by a preponderance of the evidence that Eveleth Mines engaged in a pattern or practice of discriminating against women in promotions to step-up foreman and foreman.[56]

### 3. job upgrades and temporary assignments

Plaintiffs contend that Eveleth Mines discriminates against women in job upgrades and temporary assignments. The term "job upgrades" refers to the movement from one position to another, through job postings and bidding. Job upgrades are processed solely on the basis of seniority; the person with the earliest job starting date or sequence starting date receives the upgrade.

The term "temporary assignments" refers to short-term job upgrades, which typically last between one and thirty (30) days and arise because a position is temporarily vacant. Temporary assignments are filled according to seniority, although foremen have discretion in filling temporary jobs lasting less than one week; Eveleth Mines schedules run on a weekly basis and thus they are not affected by job changes lasting less than one week. (T. Tr., 729–30, 738.)[57]

▪ The evidence in the case does not support a determination that Eveleth Mines has engaged in a pattern or practice of discriminating against women in job upgrades.

---

55. The evidence adduced at trial specifically identified one and possibly two women, Jan Wollin and Priscilla Robich, who suffered as a result of Eveleth Mines' practice of discrimination. Whether any others can be identified will be determined during the second phase of this litigation.

56. Whether any individual member of Plaintiffs is a "potential victim of discrimination" will be decided in the recovery phase of this litigation. The Court notes, however, that for the same reason that it has rejected Dr. Klem's statistical evidence on promotions—not all women are similar in their preparedness or interest in being a step-up foreman or foreman—individual members of the class will be required to show that they satisfy basic criteria for serving as a step-up foreman or foreman. For example, a female

laborer is not qualified to serve as step-up foreman on a sequence job crew. Similarly, a woman working at the bottom job class in a sequence will rarely be qualified to serve as a step-up foreman for a job crew in that sequence.

57. There was testimony that less senior male employees would receive temporary upgrades in order to train them on jobs in the sequence where the vacancy occurred. Although this arrangement technically violates the "by seniority" upgrade system, no one, with the exception of Lois Jenson, objected to less senior males being trained in a position with a higher job classification, where the training need was legitimate. The job upgrade issue is separate from Plaintiffs' claims of discrimination in training, which is discussed *infra,* Part III.B.5.

Plaintiffs' central contention is that discrimination must exist because women occupy lower job classifications than men with comparable seniority. Perhaps hoping that the truism contained in this assertion will take on a life of its own, Plaintiffs point to (1) instances in which foremen allegedly discouraged women from bidding for positions and (2) the tendency of women to congregate in certain work areas because of the alleged hostile environment. (Plfs' Post–Trial Mem., at 40–41.)

Notwithstanding their allegations, Plaintiffs have failed to prove the essence of their claim that Eveleth Mines discriminates against females in job upgrades: that women were denied job upgrades for which they bid and to which their seniority entitled them. There is no evidence that women were told not to bid for a job, that they were coerced into not bidding for a job, or that their properly filed bids went unrecognized. Similarly, there was no evidence that jobs were so male-dominated that women did not seek to obtain them when they were available. In contrast, there was testimony that some women did not apply for a position or chose to freeze-in to a position because they wanted to stay where they were or because the job available did not appeal to them. In light of such evidence, the fact that women work in lower job classifications does not warrant a conclusion that a pattern or practice of discrimination exists.

■■ As for temporary job assignments, the standard applied in pattern or practice cases compels a conclusion that Plaintiffs have failed to carry their burden of proof. Plaintiffs were required to, but did not, show that denying women temporary job assignments was Eveleth Mines' "standard operating procedure." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855. Rather, Plaintiffs merely showed that there were rare instances in which less senior males were given temporary job assignments that should have gone to women. Discrimination that occurs on an "isolated, 'accidental' or sporadic" basis is not a pattern or practice of discrimination.[58] *Id.*, 431 U.S. at 336, 97 S.Ct. at 1855. Further, Plaintiffs contention that long term temporary assignments—less than 30 days—could be made without regard to seniority was belied by the evidence; their assertion that only men received those assignments is without an evidentiary basis.

In contrast, Eveleth Mines presented credible testimony that except for training assignments, its standard operating procedure is to make temporary job assignments according to the seniority system. Although assignments under a week in duration do not affect scheduling and thus provide foremen with discretion in whether to fill the position or whether to use it for training, Eveleth Mines presented sufficient evidence to rebut any inference that foremen routinely exercised their discretion in a manner which had the purpose or effect of discriminating against women.

In summary, Plaintiffs have failed to establish by a preponderance of the evidence that Eveleth Mines has engaged in a pattern or practice of discriminating against women in job upgrades and temporary job assignments.

### 4. compensation

■■ Plaintiffs contend that Eveleth Mines discriminated against women in compensation. On average, females employed as hourly employees work in lower job classifications than males, (Defs' Exh. No. 342), the deficit of which ranges from just over two job classifications to over four job classifications. (Defs' Exh. No. 343.) As was discussed *supra*, the job classification determines rate of pay. Accordingly, women are paid less per hour and per year than men.

58. That a discriminatory act was "accidental" may be shown by an employer's effort to correct a violation. The evidence showed that when a violation of the controlling seniority rule occurred with regard to temporary assignments, Eveleth Mines corrected the error when the error was brought to its attention. For example, Kathleen Anderson testified as to an occasion when she "time-slipped" a less senior male who had been improperly upgraded over her to operate a rubber-tracked bull dozer and received the pay for the higher "rubber dozer" job classification. (IV., 113.) Anderson's testimony that her foreman retaliated against her for "time-slipping" her co-worker was unsupported by the record.

In addition, women work fewer total overtime, Sunday/holiday, and shift differential hours than men, thereby earning less non-base pay compensation.[59] (Defs' Exh. No. 335.) However, for almost every year since 1983, those categories of non-base pay compensation have been a greater percentage of women's total compensation than men's. (Defs. Exh. No. 336.)

This evidence does not support a claim of discrimination in compensation. Because women's base pay is less than men's, it is logical to conclude that non-base pay compensation would be a greater percentage of total compensation for women.[60]

Plaintiffs also presented Dr. Klem's cohort analysis[61] data, which consisted of 2 cohorts: (1) a cohort of male and female workers who were hired in 1975 and who in 1981 worked in jobs occupied by both men and women, and (2) a cohort of male and female workers who were hired in 1976 and who in 1981 worked in jobs occupied by both men and women. Dr. Klem presented compensation trends for these cohorts from 1981 through 1992. The analysis showed that for the 1975 cohort, men made anywhere $41.60 to $196.31 more per month than women.[62] For the 1976 cohort, men made anywhere from $8.86 to $101.95 more per month than women. Dr. Klem did not perform any tests of statistical significance on the numerical data generated by the cohort analysis.[63]

The disparity in the cohorts between the total compensation paid to men and women was not attributed to disparities in base pay, as men and women in the same job classification receive the same base pay. Dr. Klem believed that the disparity was produced by non-base pay compensation, particularly overtime. (III, 64–65.)

That men received compensation greater than women over the periods measured is not evidence that Eveleth Mines discriminates against women in compensation. Employees' pay and opportunities for non-base pay compensation are determined by the CBA. Under the terms of the CBA, overtime is offered so as to equalize all employees' opportunities to work overtime; those with the least overtime hours worked or rejected[64] are offered overtime before other employees. All employees are free to reject overtime, unless Eveleth Mines needs workers to put in overtime hours.[65]

59. Non-base pay compensation consists of (1) Sunday/holiday pay, which is extra compensation paid to employees who work on Sundays and holiday, (2) overtime pay, which is extra compensation paid to employees who work more than their scheduled hours, (3) "shift differential" pay, which is extra compensation paid to employees who work on either the afternoon or night shifts, rather than the day shift, and (4) step-up foreman premium pay.

No evidence was introduced regarding the effects of step-up foreman premium pay on sex-related differences in compensation.

60. Contrary to testimony by Eveleth Mines personnel, however, (T. Tr., 774), that fact alone does not warrant a conclusion that women had an equal opportunity to earn overtime and other non-base pay compensation.

61. "Cohort" analysis examines a specific subpopulation as it changes over time. In a cohort study, a unique group of individuals is identified at one point in time and then is tracked for some period of time, to observe whether and how the members of the cohort change over time. See Earl Babbie, The Practice of Social Research 89–90 (5th ed. 1989). Here, Dr. Klem's cohorts were two groups of Eveleth Mines employees who were identified as of 1981 and each of whom shared two characteristics: (1) the year in which the employees were hired; and (2) the job that they held in 1981 was held by both men and women.

62. The "dollars per month" figure was calculated by multiplying the actual cents per hour difference by 160, which Dr. Klem assumed to be the average number of regular working hours per month.

63. Because no tests of statistical significance were performed, Dr. Klem's cohort analysis is descriptive, and not analytical proof of how men and women hired in the same year are compensated.

64. Under the CBA's overtime scheme, rejecting an hour of overtime is counted as working an hour of overtime for purposes of determining which employees should be offered an overtime opportunity first.

65. Similarly, shift differential pay and Sunday/holiday pay are both paid according to the CBA. For example, if an employee works on a Sunday or holiday, she is paid the premium; if she does not, she is not paid the premium. There is no evidence that Eveleth Mines discriminated against women in these forms of non-base pay compensation.

Plaintiffs' cohort analysis, although detailed and comprehensive, is not credible proof of discrimination against women in compensation. Plaintiffs have not attempted to identify or analyze the specific causes of the disparity; mere disparity in compensation does not account for an individual's choice to freeze into a job classification, accept or reject overtime, or secure full-time day shift assignments. In addition, Plaintiffs' proof does not account for the relative availability of overtime for different shifts and job classifications. Accordingly, even though the Court assumes that Plaintiffs' cohort analysis is accurate, it is unconvinced that simple disparities in compensation, in the absence of any statistical measures of significance or anecdotal evidence, support a conclusion that Eveleth Mines has engaged in a pattern or practice of discriminating against women in compensation.

### 5. training

▮ Plaintiffs claim that there was a pattern or practice of discriminating against women in training opportunities.[66] Specifically, Plaintiffs claim that women are not trained in the duties of jobs other than their own to the same extent as males.

It is an unwritten policy at Eveleth Mines that all employees be trained in jobs 1–2 levels above their own. (T. Tr., 738.) This includes (1) training laborers on jobs which they could fill outside of a sequence or at the bottom of a sequence, and (2) training sequence employees on sequence jobs 1–2 levels above their own. (T. Tr., 154–55.)

Job-related training is provided so as to ensure that Eveleth Mines will be able to temporarily fill job vacancies as they occur, thereby promoting an effective and efficient operation. (*See* T. Tr., 1179.) Training an employee on a job takes approximately forty (40) hours. Eveleth Mines does not have a policy of training employees on all jobs within a sequence.

Training opportunities arise through the foreman's decision to place someone in a position on an ad hoc basis, or the foreman may take the advantage of a temporary vacancy and insert a person into that vacancy without regard to seniority. (T. Tr., 1155, 1169–70.) If an employee believes that a less senior employee was improperly upgraded, even if training is the stated reason for the upgrade, the senior employee can complain to the foreman and/or file a grievance. Similarly, if an employee believes that she has not received the training to which she is entitled, she can raise the issue with her foreman and/or grieve. (T. Tr., 1156.)

Whether an employee has been trained in a given job does not affect her ability to receive an upgrade—upgrades are controlled by seniority; prior training, however, may impact an employee's ability to obtain short-term temporary job assignments. Training is also important because it provides employees with knowledge of jobs higher in the sequence, which is a prerequisite to being promoted to step-up foreman. As discussed *supra*, Part III.B.2, step-up foremen generally must have knowledge of all the jobs in a sequence, but they need not work in the highest job in the sequence.[67]

Plaintiffs have failed to show a pattern or practice of discrimination against women in Eveleth Mines' job-related training. Eveleth Mines' training policy exists to protect its productivity. Importantly, there was no evidence that the training policy is either a de jure or de facto means of grooming only male employees for promotion.[68] At most, prepa-

---

66. Related to Plaintiffs' training claims are claims of class-wide discrimination in (1) hiring into Eveleth Mines' Maintenance jobs, (2) discipline, and (3) retaliation. None of these claims was supported by the evidence. The Court notes only that if Plaintiffs sought to establish that Eveleth Mines discriminated against women in hiring into Maintenance and craft-jobs, they did not offer any proof of a disparity in female hires. In addition, Plaintiffs failed to offer sufficient relevant anecdotal proof that women actually sought to obtain those jobs and were routinely denied the positions.

67. For example, Michael Norton was made a step-up foreman even though there were nine men above him in his sequence (T. Tr., 1148); however, he was trained in all jobs in the sequence.

68. There was testimony that foreman Leon Erickson introduced certain men to various jobs other than their own and took them around the Fairlane Plant. Even though this testimony was credible, anecdotal evidence of *isolated* incidents of gender-biased conduct, it does not alone establish a pattern or practice of discrimination.

ration for step-up foreman is an incidental benefit.[69]

The evidence adduced at trial shows that Eveleth Mines' routinely provided training opportunities to both men and women on an equal basis. Some female employees testified that they had not been trained in jobs 1–2 levels above their own, (see for example, T. Tr., 168–69), but the evidence did not indicate that those training failures were due to the fact that they were women. Moreover, a policy and practice of discrimination demands more than inconsistent treatment of a few class members. Finally, that women were not promoted to step-up foreman is not itself proof that Eveleth Mines discriminated against women in training.

### C. Summary of Sex Discrimination Claims

In summary, Plaintiffs have established by a preponderance of the evidence that Eveleth Mines engaged in a pattern or practice of discriminating against women in promotions to step-up foreman and foreman on the basis of their sex. Plaintiffs' proof is insufficient to establish class-wide liability on their claims of sex discrimination in hiring, job upgrades and temporary assignments, compensation, hiring into craft positions, discipline, retaliation and training.

## IV. Claims of Sexual Harassment

### A. Legal Standards

#### 1. Legal Standards Applicable to Individual Claims of Sexual Harassment

Title VII makes it

an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions or privileges of em-

ployment, because of such person's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). Harassment on the basis of sex is undeniably a form of sex discrimination. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *see 1 Larson*, § 41.62.

Sexual harassment includes unwelcome "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature [that has] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." EEOC Employment Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(a) (1985) Such harassment is known as "hostile environment" sexual harassment. To be actionable under the hostile environment theory, acts of sexual harassment must be sufficiently pervasive or severe to "alter the conditions of the victim's employment and create abusive working conditions." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). Whether the sexual conduct complained of is sufficiently severe or pervasive to create a hostile work environment must be determined from the totality of the circumstances. *Henson*, 682 F.2d at 904; *accord* 29 C.F.R. § 1604.11(b).

MHRA makes it

an unfair employment practice ... (2) for an employer, because of sex ... to discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

Minn.Stat. § 363.03, subd. 1(2)(c). Claims of discrimination based upon sex include claims of sexual harassment.[70] Minn.Stat. § 363.01, subd. 14.

---

69. In light of the fact that step-up promotions did not occur from 1983 through 1986, and only rarely occurred from 1987 through 1988, and promotions to foreman did not occur between 1982 and 1988, no Eveleth Mines hourly employee reasonably could anticipate that training would open the door to promotion.

70. MHRA defines sexual harassment as unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact

or other verbal or physical conduct or communication of a sexual nature when: ... that conduct has the purpose or effect of ... creating an intimidating, hostile, or offensive employment ... environment; and in the case of employment, the employer knows or should know of the existence of the harassment and fails to take timely and appropriate action. Minn.Stat. § 363.01, subd. 41.

■ Since *Meritor*, hostile environment claims by individuals have been common in Title VII litigation. In the Eighth Circuit, an individual plaintiff alleging sex discrimination on the basis of hostile environment sexual harassment must prove that (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action.[71] *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559 (8th Cir.1992) (*McGregor I*), *on remand*, 807 F.Supp. 506 (N.D.Iowa 1992), *rev'd*, 989 F.2d 959 (8th Cir.1993) (*McGregor II*).

Plaintiffs claim that they have been subject to sexual harassment through the maintenance of a hostile environment at the Thunderbird Mine and Fairlane Plant. By maintaining their sexual harassment claims as a class action, Plaintiffs seek to expand sexual harassment discrimination to a new arena; to the Court's knowledge, no *class* of plaintiffs has ever maintained through trial a claim of sexual harassment.

### 2. Legal Standards Applicable to Class Claims

As was discussed *supra*, Part III.A, class action claims brought under Title VII require a plaintiff class to establish by a preponderance of the evidence that the defendant engaged in a "pattern or practice of unlawful discrimination in various company policies." *Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 470 (8th Cir.1984). A pattern or practice is present when "the discriminatory acts were not isolated, insignificant or sporadic, but were repeated, routine, or of a generalized nature," *Catlett v. Missouri Highway and Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir.1987), in other words, "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States*,

431 U.S. 324, 360–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977).

In the usual "pattern or practice" case—for example, an alleged pattern or practice of discrimination in hiring on the basis of sex—a determination in the liability phase that the employer engaged in a pattern or practice of discrimination entitles the *plaintiff class* to appropriate prospective relief and entitles each *member* of the class to a presumption that the employer unlawfully discriminated against her. *Craik*, 731 F.2d at 470. Thus, in the recovery phase the burden of persuasion shifts to the employer to show that it did not discriminate against individual members of the class who show that they are potential victims of the proved discrimination, e.g., they applied for a job and were not hired. *Id.* (quoting *Teamsters*, 431 U.S. at 362, 97 S.Ct. at 1868).

■ Where, however, a plaintiff *class* brings a claim of *sexual harassment* based upon hostile environment, the determination made after the liability phase, and hence the allocation of burdens in the recovery phase, is different. The liability phase is limited to determining whether the plaintiff class has established that the employer engaged in pattern or practice of exposing women to a sexually hostile environment. This determination is the focus of the liability phase because at issue therein is the common question of law which makes a class action an appropriate vehicle for prosecuting claims of sexual harassment: "whether a reasonable woman would find the work environment hostile." *See Jenson*, 139 F.R.D. at 665.

Should the employer be found to have engaged in a pattern or practice of discriminating against women by maintaining a hostile environment, the plaintiff class will be eligible for appropriate prospective relief and other remedies consistent with a finding of liability in other pattern or practice cases. However, the nature of a hostile environment claim mandates that the nature of the recov-

---

**71.** The Minnesota Court of Appeals, in *Klink v. Ramsey County*, 397 N.W.2d 894 (Minn.Ct.App. 1986), adopted the five-factor test used in sexual harassment claims brought under Title VII. *Id.* at 901 (citing *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986)). Accordingly, consideration of Plaintiffs' MHRA sexual harassment claims will be subsumed in the analysis herein of Plaintiffs' claim under Title VII.

ery phase differ from traditional pattern and practice cases. Specifically, a determination that the employer engaged in a pattern or practice of discrimination by maintaining a hostile environment does not entitle every member of the plaintiff class to a presumption that they were sexually harassed—the burden of persuasion does not shift to the employer. *Cf. Craik,* 731 F.2d at 470 (discussing shifting burdens in typical class action). Instead, the burden of persuasion remains on the individual class members; each must show by a preponderance of the evidence that she was as affected as the reasonable woman. If this showing is made, the individual member is entitled to all the remedies available under Title VII and MHRA. In a hostile environment class action, therefore, every member of the plaintiff class remains a "potential victim" in the true sense of the term.

■ This result is dictated by the fact that the proof introduced during the liability phase cannot resolve a disparate issue of fact essential to claims alleging hostile environment: whether individual members of the plaintiff class were as affected as the reasonable woman would have been. *See Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1524 (M.D.Fla.1991). Because the *employee's* subjective response to acts of sexual harassment is an essential part of proving a claim of hostile environment sexual harassment,[72] a presumption that the employer discriminated against individual class members may not arise from a determination that the reasonable woman would have been affected by the acts of sexual harassment.[73] Individual employees should not be allowed to circumvent an essential element of a hostile environment claim merely because they are permitted to pursue their claims as a class;

Fed.R.Civ.P. 23 involves issues other than the merits of the case.

Nevertheless, as discussed *supra,* liability to the class is established by a determination that the employer engaged in a pattern or practice of exposing women to acts of sexual harassment sufficient to alter the terms or conditions of the reasonable woman's employment. Accordingly, individual class members need only show that they were at least as affected as the reasonable woman. The other elements of a hostile environment claim are established by the court's determination in the liability phase of the proceedings.

■ Based upon the foregoing discussion, the Court holds that to establish a pattern or practice of discrimination based upon a claim of hostile environment sexual harassment, Plaintiffs must show that (1) they belong to a protected group; (2) they were subject to unwelcome sexual harassment; (3) the harassment was based upon their sex; (4) the harassment would have altered a term, condition, or privilege of employment for the reasonable woman; and (5) Eveleth Mines knew or should have known of the harassment and failed to take proper remedial action.

## B. Applicability of "Continuing Violation" Theory

Eveleth Mines contends that Plaintiffs' hostile environment claim must fail because their claim is premised on acts and events occurring before the commencement of the class period—December 30, 1983. Eveleth Mines argues that under applicable precedents, a finding of class-wide liability cannot be based on evidence of sexual harassment which may have occurred prior to that date. *Hervey v. City of Little Rock,* 787 F.2d 1223,

---

72. In contrast, a pattern and practice case alleging sex discrimination in hiring or promotion is concerned at all times with the employer's actions. The actions of class members are relevant only to the extent that each must show that she applied for the job or sought the promotion. The reactions of class members, however, that is, whether a female employee was angry, sad, ambivalent or delirious at not being hired or promoted, is irrelevant to determining whether the employer discriminated against her.

73. If the burden of persuasion were shifted to the employer, the employer likely would be required to prove that individual class members were not as affected as the reasonable woman. Although requiring parties to prove the negative of a proposition is not always objectionable, such a burden is objectionable where it effectively shifts to a class action defendant the burden of proof on an issue which is carried by the plaintiff in an individual action.

1229 n. 5 (8th Cir.1986). Excluding pre-class period evidence, its argument continues, Plaintiffs have not established that a pattern or practice of sexual harassment existed after December 30, 1983.

Plaintiffs respond that acts of sexual harassment occurring prior to December 30, 1983 are actionable as part of their claim of sexual harassment. Plaintiffs argue that Eveleth Mines' policy of sexual harassment existed from 1975 and extended into the class period. Accordingly, under the "continuing violation theory," those pre-class period acts are relevant and actionable here.

■■■ The "continuing violation" theory permits courts to consider alleged discriminatory acts occurring prior to the statutory limitations period for Title VII actions where the plaintiff challenges an ongoing and continuing pattern or practice of discrimination. *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1271 (8th Cir.1990); *Gardner v. Morris*, 752 F.2d 1271, 1279 (8th Cir.1985); *Satz v. ITT Finan. Corp.*, 619 F.2d 738, 744 (8th Cir. 1980). Typically, the continuing violation theory is raised in cases where a plaintiff failed to bring an administrative claim for allegedly discriminatory acts that *preceded* acts for which complaints were brought. *Gardner*, 752 F.2d at 1279. However, a violation is not "continuing" merely because the *effects* of an allegedly discriminatory action are present during the statutory period. *Chaffin*, 904 F.2d at 1272. Rather, in Title VII cases, the critical question is whether "any present *violation* exists" during the

statutory period. *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) (emphasis supplied). Accordingly, to rely on the continuing violation theory, a plaintiff must show a "series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period."[74] *Glass v. IDS Finan. Serv., Inc.*, 778 F.Supp. 1029, 1052 (D.Minn.1991) (quoting Barbara Lindemann Schlei & Paul Grossman, *Employment Discrimination Law*, 232 (Supp.1979).

■■■ The Court will consider Plaintiffs' evidence of pre-December 30, 1983 sexual harassment under the continuing violation theory. In the arena of sexual harassment, particularly that which is based on the existence of a hostile environment, it is reasonable to expect that violations are continuing in nature: a hostile environment results from acts of sexual harassment which are pervasive and continue over time, whereas isolated or single incidents of harassment are insufficient to constitute a hostile environment. Accordingly, claims based on hostile environment sexual harassment often straddle both sides of an artificial statutory cut-off date.

Moreover, evidence of what occurred prior to the beginning of the statutory period is relevant evidence which may considered in determining whether a hostile environment existed during the relevant period. This view is implied in *Meritor:* the Supreme Court considered acts of harassment that had occurred over a four year period. At no time

---

74. Were this Court to adopt a more structured approach to the continuing violation theory, the Fifth Circuit's discussion and holding in *Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir.1989), would provide an appropriate mechanism for finding that the continuing violation theory is applicable here. In *Waltman*, the court found that the continuing violation theory could be applied to sexual harassment suits. Applying Fifth Circuit precedent, the court stated that three factors were to be considered in determining whether the theory could be applied: (1) similarity of subject matter; (2) frequency; and (3) degree of permanence. *Id.* at 475.

The first factor was easily satisfied because all the incidents related to sexual harassment. As for frequency, the court concluded that in light of the Supreme Court's decision in *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the court should review the pattern and frequency of the harassment and determine whether a reasonable person would feel that the environment was hostile throughout the period that formed the basis of the plaintiff's claim. 875 F.2d at 476. The court found that continuity could be established by evidence of incidents of harassment coupled with sexual graffiti throughout the work place. *Id.* Finally, the court concluded that permanence, which is concerned with whether an act outside the statutory period was such that it should have triggered the employee's awareness and duty to assert her rights, *id.* at 475, is not shown in a sexual harassment claim based upon hostile environment, as the acts creating the hostile environment do not have the permanence of actions such as a demotion or termination. *Id.* at 476.

did the Court mention that some of those events occurred outside the relevant time period. Similarly, in *Robinson,* the court found that incidents of harassment which predated the beginning of the statutory period were a necessary part of its review of Robinson's claims:

> The Court considered those incidents that fall outside the time frame of a Title VII complaint for the purpose of determining the context of the incidents which are actionable (i.e., whether the more recent conduct may be dismissed as an aberration or must be considered to be a part of the work environment) and for the purpose of assessing the reasonableness of the response by defendants to complaints that Robinson made during the Title VII time frame.

760 F.Supp. at 1494–95.

The time period in which Plaintiffs must establish a violation of Title VII and MHRA has a starting date of December 30, 1983. *Jenson,* 139 F.R.D. at 667. If Plaintiffs establish that Eveleth Mines maintained a company-wide pattern or practice of sexual harassment both before and after December 30, 1983, Eveleth Mines will be liable for acts of sexual harassment reaching back to the commencement of that policy, which Plaintiffs allege to be 1975. On the other hand, if Eveleth Mines establishes that the policy, even if extant prior to the statutory period, had been abolished prior to December 30, 1983, Plaintiffs cannot, as a matter of law, recover for any pre-December 30, 1983 acts of discrimination. *See Bruno v. Western Elec. Co.,* 829 F.2d 957, 960–61 (10th Cir. 1987) (deciding claim brought under Age Discrimination in Employment Act). In addition, such evidence will then be relevant only as background evidence; it may not be affirmative evidence of discrimination during the class period. *Hervey,* 878 F.2d at 1229 n. 5.

### C. Effect of Plaintiffs' Failure to Grieve Harassment

Eveleth Mines and the Union rely on the addition of a sexual harassment statement in the 1987 CBA and assert that the presence of the statement put the responsibility on Plaintiffs to follow the grievance process to resolve complaints of sexual harassment.[75] Eveleth Mines further contends that because women did not grieve incidents of sexual harassment, it cannot be liable for sexual harassment.

The Supreme Court, in *Meritor,* rejected the argument that the mere existence of a grievance procedure and a policy against sexual harassment, coupled with the employee's failure to invoke that procedure, insulated an employer from liability for sexual harassment. 477 U.S. at 72, 106 S.Ct. at 2408. Those facts, however, are relevant to determining whether an employer is liable. *Id.,* 477 U.S. at 72, 106 S.Ct. at 2408. Similarly, Minnesota courts have taken the position that an employee is not obligated to complain unless an employer's grievance procedures outline a mandatory complaint procedure or the employer has a specific policy for reporting sexual harassment. *Kay v. Peter Motor Co.,* 483 N.W.2d 481, 484 (Minn. Ct.App.1992). In addition, employees are not required to complain where the person to whom the report should be made is the harasser or has demonstrated a lack of concern. *See Weaver v. Minnesota Valley Labs.,* 470 N.W.2d 131, 135 (Minn.Ct.App.1991); *Dura Supreme v. Kienholz,* 381 N.W.2d 92, 95 (Minn.Ct.App.1986).

Plaintiffs' claim is not barred by their failure to grieve for the simple reason that the grievance procedure in the CBA and the sexual harassment provision which was added to the 1987 CBA, were insufficient to create a mandatory or effective system for raising and resolving claims of sexual harassment. Prior to 1987, the CBA did include

---

**75.** The CBA now provides:

[i]t is the continuing policy of the Company and the Union that all Employees shall be provided with a work place free of sexual harassment. Sexual harassment shall be considered discrimination under this provision. In the event any such discrimination should occur, and the Company is made aware of same, the Company shall take corrective action as appropriate. Neither the Company nor the Union shall retaliate against an Employee who complains of such discrimination, or who is a witness to such discrimination.

CBA, at 30–31.

any mention of sexual harassment. Accordingly, in the same way that polio vaccine was ineffective against polio outbreaks which preceded its development, the sexual harassment statement was completely ineffective in establishing Eveleth Mines' position on sexual harassment prior to its creation. In addition, neither Eveleth Mines nor the Union made any effort to communicate to the work force, particularly those bound by the CBA, that the stated policy against sexual harassment could and would be enforced through the grievance process. At most, that fact could be implied by the fact that the statement appeared in the portion of the CBA addressing employment discrimination.

 Moreover, that a few women used the grievance process to raise claims of sexual harassment is not sufficient to make the grievance system an effective, and therefore obligatory, means to press claims of sexual harassment. Under the existing grievance process, were a female employee to bring a charge against a fellow bargaining unit employee, the Union would be required to simultaneously press the woman's claim and seek to avoid punishment for the alleged male perpetrator. The need to stand on both sides of a charge of sexual harassment presents a potential conflict of interest which reasonably renders the CBA's grievance procedure ineffective as the primary mechanism for addressing complaints of sexual harassment brought by one bargaining unit member against another.[76]

These flaws in the grievance process were known to female employees. When combined with the Union and Eveleth Mines' half-hearted approach to addressing complaints actually brought to their attention, *see infra*, Part IV.D.5.b, the aforementioned flaws both explain and justify women's unwillingness and failure to utilize the grievance process after 1987. As the Court in

*Meritor* noted, an employer's reliance on a policy and grievance procedure "might be substantially stronger if its procedures were better calculated to encourage victims of harassment to come forward." 477 U.S. at 73, 106 S.Ct. at 2408.

### D. Analysis of Plaintiffs' Proof of Hostile Environment

Eveleth Mines, including the Thunderbird Mine and Fairlane Plant, is a male-dominated environment. Men alone were employed as hourly employees for the first ten years Eveleth Mines operated; women began to work there in 1975. Men occupy every supervisory and managerial position in the Operations area, whereas women occupy mostly lower level job classifications. As a result, relationships of authority and power always disfavor women.[77] Whether sexual harassment was the standard operating procedure at Eveleth Mines will be discussed in the following section.

#### 1. Membership in the Protected Group

It is undisputed that Plaintiffs, as women, are members of a protected group.

#### 2. Incidents of Unwelcome Sexual Harassment

##### a. Incidents of Sexual Harassment

In addition to being male-dominated in terms of power and position, Eveleth Mines is male-dominated in terms of the sexualized nature of the work place.[78] Men initiate and promulgate almost all references to sex and to women as sexual objects. In addition, male-focused references to sex and to women as sexual objects have persisted throughout the time that women have worked at Eveleth Mines, including all periods relevant to this action.

There was testimony that during the class period, visual references to sex and to women as sexual objects were found throughout

---

76. This conclusion is supported by testimony that the Union leadership advocated an ethic that members of the bargaining unit should attempt to resolve intra-Union problems without resort to management.

77. As was discussed *supra*, Part III.B.3, that women worked in low level jobs was caused by reasons other discrimination on the basis of sex.

78. Numerous witnesses testified about the presence of visual, verbal, and physical references to sex and sexual relations. The witnesses reported varying amounts of exposure to such references, but the uniformity with which they discussed the sexualized nature of the work place convinces the Court that the work place was sexualized.

Eveleth Mines, particularly the Fairlane Plant and including areas where women worked, ate, and attended to their personal needs while at work. These visual references took the primary forms of graffiti, photos, and cartoons. Some of the visual materials remained on walls or equipment for extended periods of time. Virtually all of the relevant testimony and other evidence indicates that male employees, both bargaining unit and salaried employees (including foremen), felt free to and did exhibit sexually-focused materials anywhere they chose.[79] That not all men actually engaged in such behavior does not alter the finding that men were free to do so. Similarly, although some women also exhibited similar materials, almost always in their own personal areas, e.g., lockers, their actions do not impact the class itself.

■ The posting of sexually-oriented materials in common areas may serve as evidence of a hostile environment. *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). This is true regardless of whether the visual materials relate to men or women, or both, generally, or to specific women.[80] *Waltman*, 875 F.2d at 477 & n. 3.

■ In addition to visual materials, Eveleth Mines' work environment was characterized by verbal statements and language reflecting a sexualized, male-oriented, and anti-female atmosphere. Language at Eveleth Mines was generally coarse; both men and women cursed and used words with a sexual referent. Strikingly, however, only men went further and used language either (1) referring to women generally in terms of their body parts, and/or (2) directing comments to or about specific women and their sex lives, including proposing sexual relationships and discussing sexual exploits. Related to this second variety of language was the use of "pet names" and terms that persons in romantic relationships might use, e.g., "honey" or "babe."

Much, although by no means all, of the language was not directed at a specific woman or women. Nevertheless, the language used by men did refer to women at Eveleth Mines or women in general. "The pervasive use of derogatory and insulting terms relative to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990); *see Waltman*, 875 F.2d at 477. Whatever the focus of the language, therefore, women at Eveleth Mines were subjected to language which derogated them and their sex in general, either by the meaning of the words themselves or through the meaning which was derived from the way in which the words were uttered. No female employee should be required to confront sexually suggestive language and noises from male employees, either individually or in groups. *See Tunis v. Corning Glass Works*, 747 F.Supp. 951 (S.D.N.Y.1990); *see McGregor II*, 989 F.2d at 964–65.

Finally, some women at Eveleth Mines were subjected to physical acts that reflected a sexual motive or concern on the part of the perpetrator. These incidents ranged from a male pretending to perform oral sex on a sleeping woman co-worker to a man touching a woman in an objectionable manner, to women being presented with various dildos, one of which was named "Big Red." However, this conduct was less common than either visual materials or verbal statements. In fact, few women raised experiences involving offensive physical conduct.

In addition to evidence of specific acts of sexual harassment, Dr. Eugene Borgida appeared as an expert witness on Plaintiffs' behalf to testify on the subject of sexual stereotyping and its relationship to acts of

---

**79.** Part of this freedom likely resulted from Eveleth Mines' failure to address the problems in its work place after it received reports and complaints concerning sexually-oriented behavior. *See infra*, Part IV.D.5.

**80.** In *Bennett*, the court provided a succinct review of why visual materials of a sexual nature, regardless of their gender orientation, may form the basis for claims of hostile environment: "any reasonable person would have to regard [such materials] as highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and with the barrier of sexual differentiation and abuse." 845 F.2d at 106.

sexual harassment which occurred at Eveleth Mines.[81]

Stereotyping is a thought process whereby people apply various personality attributes and characteristics that they have in mind concerning an identifiable group, e.g., women, to specific individuals who are members of that group. (III, 124.) As a result, individual members of groups are categorized on the basis of attributes that exist at the group level. Sex stereotyping, specifically male sex stereotyping of women, involves the thought process whereby "women are perceived in categorical terms, in terms of a stereotype of what women are like, how they think and what their attributes are. Its a thought process where by women are considered in generalized terms." (T. Tr., 489.)

As factual bases for his testimony, Dr. Borgida reviewed the exhibits produced by the parties, 20 deposition digests of male employees at Eveleth Mines and 10 deposition digests of female employees, the complete depositions of Robert Raich, four female employees, Dr. Klem, and Dr. Susan Storti (Eveleth Mines' expert witness), conducted approximately one hour long interviews with the named plaintiffs, reviewed summaries of the 1991 proceedings and personally observed testimony at trial. Based on this review, Dr. Borgida opined that "sex stereotyping exists at Eveleth Mines and manifests [itself] throughout the work environment." (T. Tr., 489.)

Dr. Borgida concluded that the major effect of sex stereotyping was "sexual spill-

over," which is the idea that "the sexual dimension that characterizes male-female relationships outside of a work environment spills over, . . . into the work environment, and . . . becomes part of the working environment." (T. Tr., 490.) Sexual spillover creates a sexualized work environment, which Dr. Borgida found to be represented by sexual photographs, cartoons, and jokes, as well as sexual language directed at women.

Dr. Borgida identified three preconditions that enhance the presence of stereotyping in the work place: (1) rarity[82]; (2) sexualized work environment[83]; and (3) ambiguous criteria for evaluating employee performance.[84] (III, 134–35.) On cross-examination, Dr. Borgida was asked about a fourth precondition which he had identified in a scholarly article published in 1981. This fourth precondition, "paucity of information," is the lack of "individuating" information, that is subjective information about a particular individual. (III, 186.) Dr. Borgida testified that he had not relied on the paucity of information precondition; the relevance of that precondition had been qualified in subsequent research. (III, 187–88.)

In 1992, Dr. Borgida repeated much of his testimony concerning the three preconditions. He also presented testimony concerning two other areas. First, he elaborated on the "paucity of information" precondition, stating that three separate aspects of this precondition can be associated with stereotypic thinking: (1) lack of information; (2) a

81. Dr. Borgida holds his doctorate in psychology and currently is a Professor and the Director of the Ph.D. program in Social Psychology at the University of Minnesota. Dr. Borgida has performed numerous research studies on the subject of sexual stereotyping and has presented his findings in several scholarly articles and at numerous academic conferences. Dr. Borgida occasionally consults with attorneys concerning sexual stereotyping, but previous to this case, only as that theory is applied to sex discrimination—as opposed to sexual harassment. (III, 114.) The Court accepted Dr. Borgida, over Eveleth Mines' challenge, as an expert in sex stereotyping.

82. "Rarity" exists when a skewed sex ratio is present, i.e., the number of women is small in relation to men. (III, 134.) Where rarity exists, men pay more attention to any one woman's

presence and scrutinize her more intensely. (III, 136.) In addition, one dimension of the sexual stereotype of women, their role as sex objects, is very salient when rarity exists and becomes a basis for judging women. (III, 137.)

83. "Sexualized work environment" exists where sexually-oriented materials are present, including photographs, graffiti, and jokes, language is sexual in nature and reference, and physical acts which are sexual in nature occur in the work place. (III, 139.) A sexualized work environment will exist where sexual spillover occurs. (T. Tr., 491.)

84. "Ambiguous criteria" exists where the criteria for evaluating employee performance are subjective or open-ended, rather than structured and specific. (III, 148.)

mixture of relevant and irrelevant information, resulting in ambiguous information; and (3) the presence of irrelevant information. (T. Tr., 492.) Dr. Borgida testified that as a result of subsequent research, he had decided to afford the paucity of information factor less weight as a precondition to sexual stereotyping at Eveleth Mins. (T. Tr., 554.)

Second, Dr. Borgida related the results of a research study which he had conducted subsequent to the 1991 hearing. The study focused on the "priming" effect that a sexualized work environment can have on stereotypic thinking and whether that effect is linked to sexually harassing behavior.[85] (T. Tr., 495.) Dr. Borgida's research showed that men [86] exposed to priming materials—advertisements that were rated as "sexist"—thought of, evaluated, and acted toward women in sexual terms more than men who were not primed.[87] (T. Tr., 501–05.)

Eveleth Mines failed to provide any basis for questioning the sexual stereotyping theory and its relationship to the work place. Although Eveleth Mines focused on questioning Dr. Borgida's conclusions about (1) the effect that sexual stereotyping could have at Eveleth Mines, and (2) the sources of priming materials, the Court concludes that Eveleth Mines failed to provide any bases on which to discredit Dr. Borgida's testimony concerning sex stereotyping.

It is true that sexual stereotyping has only rarely been applied to claims of sexual harassment and that applying sexual stereotyping to hostile environment claims is an extension of the theory. (T. Tr., 549.) *See Robinson,* 760 F.Supp. at 1502–05. Nevertheless, sexual stereotyping is relevant to the question whether women were sexually harassed at Eveleth Mines because all three preconditions exist at Eveleth Mines. First, the number of women at Eveleth Mines is far below the 15% figure which Dr. Borgida testified was a baseline for rarity. Second, as has been previously discussed, the work place contained sexually-focused materials and behavior, thereby supporting a conclusion that the work place was sexualized. Third, although seniority governs movement into hourly jobs, criteria for evaluating performance, if any exist, are subjective and ambiguous.

The court has already found that women at Eveleth Mines were exposed to sexually-focused visual materials as well as verbal and physical conduct that was sexually-focused. The Court has further concluded that said materials and conduct constitute acts of sexual harassment. Although the Court's findings and conclusions would remain the same absent Dr. Borgida's testimony, his testimony on sexual stereotyping provides a sound, credible theoretical framework that confirms

85. "Priming" describes the tendency of sexual materials to activate sexual stereotypes of women, particularly thoughts of women as sex objects. (III, 144–45.)

86. "Men" in this study means college-age students participating in a controlled experiment.

87. The study had three parts to it. After being exposed to *sexist* or *nonsexist* advertisements, the subjects were asked to participate in a word recognition exercise. The results of the study showed that subjects who were primed with sexist materials responded more quickly—as measured in time latency of response—to words rated as sexist, e.g., "babe" and "slut," and words rated as double entendre, e.g., "beaver" and "strip," than men who were not primed. (T. Tr., 500–01.) The differences in response time were statistically significant.

Next, the subjects were asked to participate in a mock interview exercise. They were told that they would be viewing a woman for an office manager position. Half of the subjects were assigned to a high-power condition—they were told they would have input on whether the woman was hired—and half were assigned to a low-power condition—they were told that the woman had already been hired. The subjects were asked to select interview questions from a list of questions that were rated as either sexist or nonsexist. After the interviews were conducted, the subjects evaluated the female interviewee.

The results showed that subjects who had been sexually primed selected almost twice as many sexist questions as subjects who had not been primed. The results further showed that men who had been primed moved physically closer to the woman than non-primed males and evaluated the female interviewee in a sexist manner—rating her as "more friendly and less competent." (T. Tr., 503.) Finally, the study showed that both the interviewee and a group of neutral observers rated the primed males as (1) physically moving significantly closer to the woman, (2) being more sexually motivated and interested in the woman, and (3) more frequently looking at her body, than non-primed males. (T. Tr., at 505.)

the Court's conclusion that the presence of the visual materials as well as verbal and physical behaviors previously described constitute acts of sexual harassment. In addition, sexual stereotyping generally, and "priming" research specifically, provide a framework for understanding why consistent and pervasive acts of sexual harassment occur in work environments similar to Eveleth Mines. *Accord, Robinson,* 760 F.Supp. at 1505.

### b. Unwelcome Nature of the Harassment

 Incidents of sexual harassment must also be "unwelcome." "The threshold for determining that conduct is unwelcome is that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive." [88] *McGregor I,* 955 F.2d at 565. Where an individual claim is at issue, this determination is to be made by considering whether the employee, "by her conduct indicated that the alleged sexual advances were unwelcome." *McGregor II,* 989 F.2d at 962. Where a class action claim is at issue, a finding of unwelcomeness will be justified where the plaintiff class shows by a preponderance of the evidence that women, by their conduct indicated that the acts of sexual harassment were unsolicited and regarded as undesirable or offensive.

 The evidence in this case warrants a conclusion that Plaintiffs have shown by a preponderance of the evidence that the acts of sexual harassment detailed above were unwelcome. There was no credible evidence that any of the acts of sexual harassment were solicited. In addition, there was testimony that women removed pictures, erased or obliterated graffiti, complained about verbal comments and on some occasions told their male co-workers that their actions were improper. Further, there was scant evidence that women either invited acts of sexual harassment or found such acts to be unoffensive.

Eveleth Mines contends that because women cursed and used coarse language while working at Eveleth Mines, they could not have viewed males' actions as unwelcome. Eveleth Mines goes so far as to assert that women and men used "identical language" and told the same types of "jokes" in the work place. (Defs' Post–Trial Reply Mem., at 25.)

Women's actions and use of language is relevant evidence in determining whether women found particular conduct unwelcome. *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406. However, as it regards the use of identical language, Eveleth Mines' assertion is unsupported by the evidence and as it regards the telling of sexual jokes, the assertion constitutes Eveleth Mines' attempt to do what it chides Plaintiffs for allegedly doing: drawing generalizations from isolated incidents. First, although women at Eveleth Mines cursed, some freely, there was no evidence that women used language and epithets which were "intensely degrading" to women, e.g., "bitch," "whore", and "cunt," words which derive "their power to wound not only from their meaning but also from 'the disgust and violence they express phonetically.'" *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983) (quoting C. Miller & K. Swift, Words and Women 109 (1977)); *see McGregor II,* 989 F.2d at 964–65 (quoting *Katz* ). In addition, women did not discuss their sex lives at work in front of men, nor did they, with the exception of one woman on one occasion, engage in questioning men about their sex lives or interest in sexual activities.

Moreover, women's "use of foul language or sexual innuendo in a consensual setting does not waive their 'legal protections against unwelcome harassment.'" *McGregor II,* 989 F.2d at 963 (quoting *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987) (quoting *Katz,* 709 F.2d at 254 n. 3)). That women say "fuck" at work does not imply that they are inviting any and every form of sexual harassment. *See McGregor II,* 989 F.2d at 963–64.

---

88. In *McGregor II,* the court stated that the threshold for determining that conduct is unwelcome is "whether it was uninvited and offensive." 989 F.2d at 962 (citing *McGregor I, 955* F.2d at 565). This statement is not materially different from that appearing in *McGregor I* and relied upon here.

### 3. The Harassment was Based Upon Sex

■■■ "[S]exual behavior directed at [women] raises the inference that the harassment is based upon her sex." *McGregor I*, 955 F.2d at 564. As discussed *supra*, the record contains sufficient instances of sexual behavior directed at women, both during the class period and before, to warrant a finding that the harassment, because of its sexual nature, was based upon women's sex. Moreover, even if some of the behavior that occurred at Eveleth Mines did not originate with the intent of offending women, it was disproportionately offensive or demeaning to women. *See Robinson*, 760 F.Supp. at 1522–23. Dr. Borgida's expert testimony about sex stereotyping is sound evidence that the presence of sexual graffiti, photos, language and conduct, some of which may have existed at Eveleth Mines for years prior to women entering the work force, created a sexualized work environment which detrimentally affected women. Their presence told women that the sex stereotypes reflected in and reinforced by such behavior were part and parcel of the working environment at Eveleth Mines.[89]

### 4. The "Reasonable Woman" Would Find That The Harassment Affected a Term, Condition, or Privilege of Employment

■■■ To affect a "term, condition, or privilege" of employment of employment within the meaning of Title VII and MHRA, the harassment must be "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson*, 682 F.2d at 904). This requirement may be shown by proof that the sexual harassment was sufficiently "severe or persistent 'to affect seriously [the victim's] psychological well-being.'" *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1561 (11th Cir.1987) (quoting *Henson*, 682 F.2d at 904).

■■■ Determining whether such an environment exists must be made by the trier of fact in light of the totality of the circum-

---

89. Eveleth Mines contends that this Court may not rely on the presence of sexual stereotypes or undirected expression of gender intolerance because to do so would create "an irreconcilable conflict with the First Amendment." (Defs' Amended Proposed Findings of Fact and Conclusions of Law, ¶ 37.) Eveleth Mines argues that to create liability under Title VII, a stereotype must be directed at an individual in the form of action that may properly be prohibited by Title VII. *Id.* However, it continues, statements which reflect sexual stereotypes, but which are not directed at any individual, may not be the basis of liability; Title VII may not regulate speech reflecting bigotry without some connection to conduct.

The Court agrees that Title VII does not prohibit stereotyping or any other cognitive process, so long as that "state of mind" is not exhibited in behavior. However, the Court disagrees with Eveleth Mines' contention that "undirected" expressions of gender intolerance may not be prohibited under Title VII. In making this argument, Eveleth Mines fails to acknowledge that Title VII—and MHRA—is concerned with regulating the work place, not society generally. As a result, acts of expression which may not be proscribed if they occur outside of the work place may be prohibited if they occur at work.

Specifically, as it relates to claims of discrimination based upon the existence of a hostile environment, Title VII prohibits behavior that creates a work environment which is hostile to a protected group. In contrast to the larger social context, therefore, expression in the workplace that is offensive to and has a psychological im-

pact on a member of a protected group may be prohibited. *See Meritor*, 477 U.S. at 65–66, 106 S.Ct. at 2405 (Title VII affords employees the right to be free from discriminatory "intimidation, ridicule and insult"); 29 C.F.R. § 1604.-11(a)(3) (sexual harassment includes "verbal or physical conduct" where such conduct "has the purpose of effect of . . . creating an *intimidating, hostile, or offensive working environment.*") (emphasis added). In this way, Title VII may legitimately proscribe conduct, including undirected expressions of gender intolerance, which create an offensive working environment. That expression is "swept up" in this proscription does not violate First Amendment principles. *R.A.V. v. City of St. Paul*, — U.S. —, —, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992).

For example, wearing a shirt on a street corner which says "a woman's place is on her back," would not subject the wearer to prosecution if the shirt's only characteristic is to communicate words of "gender intolerance." *Id.* at —, 112 S.Ct. at 2546. However, that same shirt, if worn at work, is an act of expression that may be proscribed by Title VII, even though it is directed only at women generally.

In the same way, graffiti which depicts a man with his finger inserted in a woman's rectum, (*see* Plfs' Exh. No. 59), may only reflect a sex stereotypic view that women are essentially sex objects, but if it appears on the wall of a work place, as it did here, it may serve as a basis for a determination that a hostile environment exists, even though it is not directed at any woman.

stances. *McGregor I*, 955 F.2d at 564; *Hall v. Gus Constr. Co.* 842 F.2d 1010, 1013 (8th Cir.1988).

> Under the totality of the circumstances analysis the district court should not carve the environment into a series of discrete incidents and then measure the harm occurring in each episode. Instead, the trier of fact must keep in mind that 'each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'

*McGregor I*, 955 F.2d at 564 (quoting *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla.1991)); *see also Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1510–11 (11th Cir.1989) (citations omitted).

■ In order to successfully establish this fourth factor, a plaintiff must establish that (1) the reasonable woman would consider the conduct sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, *and* (2) the plaintiff was as an "affected individual," that is, that she was as affected by the conduct as the reasonable woman. *Robinson*, 760 F.Supp. at 1524.

■ As was discussed *supra*, only one-half of the required showing need be made in the liability phase of a class action lawsuit: would the "reasonable woman" consider the conduct sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment? Evidence of sexual harassment directed at all women employees is relevant to determining whether the harassment of women rose to a level sufficient to alter the conditions of employment and create an abusive working environment in the mind of the reasonable woman. *Cf. Hall*, 842 F.2d at 1015 (in an individual claim of sexual harassment, evidence of sexu-

al harassment directed to other employees is relevant to show a hostile environment).

■ Women employees who testified at trial expressed different perspectives on the acts of sexual harassment occurring at Eveleth Mines; some were offended and affected a great deal by almost everything, whereas others were offended or affected only to a limited extent.[90] All of this testimony was credible. However, the Court finds that the effect, and possibly the intent, of the sexualized environment that existed at Eveleth Mines was to inform women that they were perceived primarily as sexual objects and inferior to men, rather than as co-workers, and that these perceptions were an integral part of working at Eveleth Mines.

There was also testimony by men who work at Eveleth Mines that Eveleth Mines was not a sexually-charged work environment and that women did not complain of sexual harassment, at least to them. As with many gender-related issues however, men, when they are in the majority and when they control the avenues of power, and thus are generally immune to unwelcome conduct, may fail to observe what a reasonable woman perceives on a continual basis. Differences in perception, therefore, are attributable to the fact of gender; that women were offended when men were not does not alter the possibility that a woman's negative reactions to offensive conduct were reasonable.

■ As it is used in a hostile environment case, "employment" relates to the entire context in which an individual or group of people work. It includes not only the activities comprising the specific tasks for which employees are compensated, but also the overall ability of an employee or group of employees to spend their work hours focused on concerns relating to work and themselves as workers. A work environment affects a term or condition of employment, that is, it is "hostile" to women, when a woman or women

---

**90.** As detailed herein, most of the harassment was of a sexual nature. However, sexual harassment is not limited to behavior which contains a sexual referent; rather intimidation and hostility towards women because they are women can establish a claim of sexual harassment. *Hall v. Gus Constr., Inc.*, 842 F.2d 1010, 1014 (8th Cir.

1984). Examples of this behavior include (1) the "fuck the women" sign which appeared in Jenson's work area after this action had been commenced, (T. Tr., 44), and (2) the way in which Anderson was treated when she sought to have a satellite bathroom provided to her at the Thunderbird Mine.

must spend their work day running a "gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson*, 682 F.2d at 902). In other words, where women are presented with constant and pervasive references to women, perhaps even themselves, as sexual objects and are subjected to acts in which their sexuality and sex role is elevated over their status as an employee,—that is, they are subject to pervasive sexual harassment on account of their sex—the reasonable woman would find the terms, conditions, and privileges of her employment affected by that sexual harassment.

The Court finds that women at Eveleth Mines worked in an environment where women were viewed primarily in terms stereotypic of women qua women: sexual objects and inferior to men when it came to working at Eveleth Mines. Moreover, because a totality of the circumstances analysis requires that all relevant aspects of the work environment be considered, Dr. Borgida's testimony provides a sound evidentiary basis which confirms this conclusion.[91]

Taking into account the totality of the circumstances and all relevant evidence, the Court concludes that a reasonable woman would find that the working environment at Eveleth Mines, both during the class period and before, altered the terms and conditions of her employment and was abusive. This conclusion is based upon all the sexually-focused materials, language, and behavior, as well as the non-sexual expression and conduct which expressed hostility to women. In addition, the expert testimony and the testimony of women working at the mines provides a reliable basis to conclude that the work environment at Eveleth Mines would affect the psychological well-being of a reasonable woman working there, whether that well-being is considered in terms of work performance or stress. This conclusion is an objective one and is not affected by the fact that some women did not find the work environment objectionable or did not complain about the work environment. *See Robinson*, 760 F.Supp. at 1525.

### 5. Management's Knowledge of and Response to Sexual Harassment

 The final element of a claim of class-wide liability is whether the employer "knew or should have known of the harassment and failed to take proper remedial action."[92] An employer may be charged with knowledge when an employee or employees complain to management, or when the sexual harassment is pervasive, which gives rise to an inference of knowledge or constructive knowledge. *Henson*, 682 F.2d at 905 (citing *Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir.1981)) (discussing hostile environment based upon race); *Kay v. Peter Motor Co.*, 483 N.W.2d 481, 484 (Minn.Ct.App.1992) (citing *Bersie v. Zycad Corp.*, 417 N.W.2d 288, 291 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. May 5, 1988)). Where an employer has knowledge of sexual harassment, "proper remedial action" means that the employer promptly takes steps "reasonably calculated to end the harassment."[93] *Barrett v. Omaha*

---

**91.** As was discussed *supra*, Part IV.D.2.a, Dr. Borgida's testimony is confirmatory. That is, the Court's findings and conclusions regarding the presence of acts of sexual harassment and the effect of said acts on the reasonable woman are aligned with, but are not dependent upon, sexual stereotyping theory or research which has followed from that theory.

**92.** *Meritor* rejected the notion that an employer could be strictly liable for acts of sexual harassment by its employees. 477 U.S. at 69–70, 106 S.Ct. at 2407.

**93.** The District of Columbia Circuit, in *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981), succinctly stated the employer's burden when it knows of sexual harassment:

an employer should promptly take all necessary steps to investigate and correct any harassment, including warnings and appropriate discipline directed at the offending party, and should generally develop other means of preventing harassment within the [organization].
*Id.* at 947.

Similarly, The Minnesota Supreme Court, in *McNabb v. Cub Foods, Inc.*, 352 N.W.2d 378 (Minn.1984), listed certain actions which, when taken in response to a claim of sexual harassment, could, depending on the specific circumstances, constitute timely and appropriate action: (1) disseminate an anti-sexual harassment policy; (2) transfer employees to another shift; and (3) take disciplinary action or threaten such action against offending employees. *Id.* at 384. Where the identity of a harasser is not known, an em-

*Nat'l Bank,* 726 F.2d 424, 427 (8th Cir.1984); *Continental Can Co. v. Minnesota,* 297 N.W.2d 241, 249 (Minn.1980) (employer liable under MHRA for sexual harassment when employer "knew or should have known" of sexual harassment and "fails to take timely and appropriate action").

### a. Knowledge of Sexual Harassment

█ Sexual harassment at Eveleth Mines was so pervasive that an inference of knowledge arises. Sexual harassment can be considered pervasive when "the harassing behavior happens frequently enough that the employer can take steps to prevent it." *Robinson,* 760 F.Supp. at 1531. The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert. *See Waltman,* 875 F.2d at 478–79; *Robinson,* 760 F.Supp. at 1531. In addition, many of Eveleth Mines' first-line supervisors had actual knowledge of the harassing behaviors: some foremen participated in them and others worked closely with those who did. Further, management personnel testified that they saw photos and graffiti of a sexual nature. Finally, the Court agrees with *Robinson* that the size of a plant or facility may increase, but does not decrease, an employer's burden to provide an environment reasonably free of sexual harassment. 760 F.Supp. at 1531.

### b. Eveleth Mines' Response

█ Given its knowledge, Eveleth Mines had an obligation to respond to its sexually hostile work environment. Its response, however, was at most situation-specific: Eveleth Mines responded only to complaints about specific incidents of sexual harassment. At no time did Eveleth Mines take any steps to determine whether the incidents were indicative of a larger problem requiring a company-wide response. *See Rauh v. Coyne,* 744 F.Supp. 1186, 1189 (D.D.C.1990). In addition, Eveleth Mines never established a system for either creating or processing records of complaints, although such records could have facilitated monitoring the work environment for its sexual hostility.

As for the visual materials which came to Eveleth Mines' attention through the knowledge of management, most did not have an identifiable owner, author, or creator; however, certain materials appeared in offices shared by identifiable foremen, or on or in specific foremen's desks.[94] In those instances, possession or control could be determined. On whomever fell the responsibility for placing the materials in the workplace, Eveleth Mines did not, on an official and company-wide basis, seek to prevent such materials from remaining there.[95] No management personnel was assigned responsibility for controlling sexual and anti-female materials and with some individual exceptions, no one in management sought to address the situation.

Similarly, little to no effort was made to identify or discipline the persons responsible for displaying offending material. Although Eveleth Mines properly points to the difficulty of controlling graffiti and other visual materials, it has not identified a reason for its failure to even try. *See Continental Can Co., Inc. v. Minnesota,* 297 N.W.2d 241, 250 (Minn.1980); *McNabb v. Cub Foods, Inc.,* 352 N.W.2d 378, 384 (Minn.1984); *cf. Tunis v. Corning Glass Works,* 747 F.Supp. 951, 954–55 (S.D.N.Y.1990) (management spoke to employees about harassing behavior and asked union steward to identify anyone who might be engaging in the behavior), *aff'd,* 930 F.2d

ployer is not necessarily free to ignore the harassment; disseminating an anti-harassment policy could be a necessary part of taking appropriate action. *Continental Can,* 297 N.W.2d at 250.

94. It is possible that female employees were responsible for the graffiti and photographs that were found. However, the Court finds that the evidence supports only one conclusion: male employees created the graffiti and introduced the photographs into the workplace.

95. The Court rejects Eveleth Mines' assertion that "all employees share responsibility" for preventing graffiti. (Defs' Post–Trial Reply Mem., App., at 27.) Whatever moral or ethical "responsibility" employees have for eradicating offensive graffiti when they know or should know it exists, the only responsibility at issue here is legal in nature and rests solely with Eveleth Mines.

910 (2d Cir.1991) (mem.). Finally, Eveleth Mines made no effort to communicate with its male employees concerning "the nature and the need to show respect to female employees." *Robinson,* 760 F.Supp. at ·1532.

 Neither Title VII nor the MHRA imposes a duty on employers to maintain a "pristine" working environment. *See Continental Can,* 297 N.W.2d at 249 (applying MHRA). In addition, evaluating the work environment for women at a given employer cannot be done blindly and without regard to the nature of the work and work force. Nevertheless, both Title VII and MHRA require an employer to make a timely and appropriate action where it knows or should know that its employees are subject to acts of sexual harassment. In work places which have been traditionally male and where females constitute a small minority of the employees, employers may have an increased obligation to create environments which are safe for all employees. Whatever an employer's responsibility may be in that situation, it cannot close its eyes when confronted with incidents of sexual harassment; it has the obligation to determine the scope of the problem and takes steps to alleviate it.

Where management does not lead, employees often will not proceed on their own accord. Despite the pervasive presence of sexually offensive materials and other acts of sexual harassment, Eveleth Mines made no effort eradicate the hostile environment existing within its facilities.[96] Accordingly, the Court concludes that based upon the circumstances existing both prior to and during the class period, Eveleth Mines failed to take prompt remedial action to alleviate the hostile environment. In this sense, Eveleth Mines tolerated and thereby facilitated a work *environment* that was hostile to women, *see Cub Foods,* 352 N.W.2d at 384, thereby making sexual harassment the "standard operating procedure" at Eveleth Mines.

### E. Summary of Sexual Harassment Claim

In summary, Plaintiffs have established that Eveleth Mines engaged in a pattern or practice of maintaining an environment sexually hostile to women. Plaintiffs have further established that the practice of sexual harassment was a continuing one: it existed both prior to and during the class period. What, if any, individual damages resulted from this policy of sexual harassment is relevant only during the recovery phase of the proceedings and will be determined therein. Accordingly, the Court expresses no opinion on that issue.

## V. Summary of Class-wide Liability Determinations

As a result of the Court's analysis of the claims asserted by Plaintiffs and discussed herein, the Court holds that Plaintiffs have demonstrated a pattern and practice of discrimination relating to their claims of (1) sex discrimination in promotions to step-up foreman and foreman and (2) sexual harassment. Plaintiffs have not prevailed on their claims relating to sex discrimination in hiring, job assignments and upgrades, compensation and training.

## VI. Injunctive Relief

 Where there has been a determination of class-wide liability for acts of discrimination, an award of injunctive relief is appropriate. *Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir.1984). In awarding injunctive relief, this Court must "render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

 In this case, injunctive relief must be both negative and mandatory. Simply enjoining Eveleth Mines from engaging in or permitting further sexually harassing behav-

---

**96.** Testimony indicated that subsequent to the 1991 proceedings herein, Eveleth Mines made efforts to remove offensive visual materials. The current status of such materials at the Thunderbird Mine and Fairlane Plant is uncertain. It is undisputed that, aside from the policy statement in the CBA, Eveleth Mines has not made any effort to control or prevent, on company-wide basis, acts of sexual harassment.

ior likely will not provide the cleansing breeze necessary to eliminate the sexually hostile working environment. Accordingly, the following affirmative steps must be taken to change the working environment: (1) developing programs to educate male and female employees, including both hourly and supervisory personnel, on permissible and impermissible conduct, and (2) instituting a system of reporting, investigating, and re-.solving claims of sexual harassment so that women employees may have some certainty that their legitimate claims of sexual harassment will be redressed, and so that male employees will have proper notice that their inability or unwillingness to conform their behavior to established standards will result in sanctions "commensurate with the seriousness of the offense." *Robinson*, 760 F.Supp. at 1534.

Because the Court has been presented with only Holly Nordquist's testimony concerning the components of an effective sexual harassment policy and reporting procedure, the Court is currently unable to order injunctive relief with appropriate detail. However, the Court directs that Plaintiffs, consistent with a separate Order filed concurrently with the Order herein, submit a proposed sexual harassment policy and procedures for reporting, investigating, and resolving claims of sexual harassment at Eveleth Mines. Consistent with the terms of the separate Order, Eveleth Mines will have the opportunity to present objections and alternatives to the Court.

**VII. Attorney's Fees**

■■■ Title VII and MHRA authorize an award of attorney's fees to the "prevailing party" in cases brought under their authority. 42 U.S.C. § 2000e–5(k); Minn.Stat. § 363.14, subd. 3. The Supreme Court and Minnesota courts interpret the attorney's fees sections to require the award of fees "unless special circumstances would render an award unjust." *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 416–17, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978); *see Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619, 628 (Minn.1988) (adopting

Title VII standard and procedure for awarding attorney's fees).

Plaintiffs have prevailed on their claims of sex discrimination in promotions and sexual harassment. No special circumstances exist which would render an award unjust. Accordingly, Plaintiffs will be entitled to costs, including reasonable attorney's fees, which they have incurred in connection with prosecuting those claims.

**Conclusion**

Accordingly, based upon the files, records and proceedings herein, **IT IS ORDERED** that:

1. Plaintiffs are entitled to an order for judgment against defendants on Plaintiffs' class-wide claims of (1) sex discrimination in promotions to step-up foreman and foreman, and (2) sexual harassment;

2. Plaintiffs' class-wide claims of sex discrimination in hiring, job upgrades and assignments, compensation, training, hiring into craft positions, discipline and retaliation are DISMISSED WITH PREJUDICE;

3. Plaintiffs shall be awarded appropriate injunctive relief;

4. Plaintiffs shall be awarded their reasonable costs and attorney's fees from defendants Eveleth Taconite Company, Eveleth Expansion Company, Oglebay Norton Company Oglebay Norton Taconite Company; and

5. Following the status conference to be held on June 22, 1993, a separate order for judgment will be entered regarding the foregoing matters.